Darren W. Saunders (DS 0456)
Mark I. Peroff (MP 6858)
Joanna A. Diakos (JD 7269)
KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
Telephone: 212.536.3900
Facsimile: 212.536.3901


SEP 1 ? 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Attorneys for Plaintiffs Cerveceria Modelo, S.A. de C.V.
and Marcas Modelo, S.A. de C.V.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CIV 7998**

------------------------------------------------------------X
                                :

CERVECERIA MODELO, S.A. DE C.V. and
MARCAS MODELO, S.A. DE C.V.,
                                :
                                :
                 Plaintiffs,     :
                                :
      -against-                   :  Civil Action No. _____
                                :
USPA ACCESSORIES LLC d/b/a CONCEPT ONE
ACCESSORIES,
                                :
                 Defendant.    :
------------------------------------------------------------X

## COMPLAINT

Plaintiffs, Cerveceria Modelo, S.A. de C.V. (hereinafter "Modelo"), and Marcas Modelo,

S.A. de C.V. (hereinafter "Marcas Modelo") (together "Plaintiffs"), for their complaint herein

allege as follows:

### NATURE OF ACTION

1.     This action arises under the Trademark Act of 1946, as amended, 15 U.S.C.

§ 1051 *et seq.*, for infringement of federally registered trademarks in violation of Section 32 of

the Trademark Act, as amended 15 U.S.C. § 1114; for federal trademark dilution in violation of

Section 43(c) of the Trademark Act of 1946, 15 U.S.C. § 1125(c), as amended by the Trademark

Revision Dilution Act of 2006; for unfair competition in violation of Section 43(a) of the

Lanham Act; for related claims of unfair competition and trademark infringement in violation of

Plaintiffs' rights at common law; for injury to business reputation and dilution and deceptive acts

and practices under state statutory law; and for breach of contract.

## JURISDICTION AND VENUE

2.      This action is within the jurisdiction of the Court by virtue of 15 U.S.C. § 1121

and 28 U.S.C. § 1331, in that Counts I through III arise under the Lanham Act, 15 U.S.C. § 1051,

*et seq.*

3.      This Court has jurisdiction over Plaintiffs' claims arising out of Defendant's

unfair competition violations pursuant to 28 U.S.C. § 1338 and over Defendant's violations of

common law pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiffs'

Lanham Act claims that they form part of the same case or controversy under Article III of the

United States Constitution.  This Court also has jurisdiction over the claims asserted herein

pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship among the parties and the

amount in controversy as to each claim exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because

Defendant resides in this district and a substantial part of the events or omissions giving rise to

the claims in this action occurred in this district.

## THE PARTIES

5.      Plaintiff Modelo is a Mexico corporation with its principal place of business at

Lago Alberto No. 156, Colonia Anahuac, 11320 Mexico, D.F.

6.    Plaintiff Marcas Modelo is a Mexico corporation with its principal place of business at Ave. Javier Barros Sierra No. 555, piso 3, Colonia Santa Fe, 01210, Mexico, D.F.

7.    Upon information and belief, defendant USPA Accessories LLC d/b/a Concept One Accessories (hereinafter "Defendant" or "Concept One") is a New York limited liability company having its principal place of business at 362 Fifth Avenue, New York, New York 10001. Upon information and belief, Concept One distributes and sells a variety of licensed clothing and accessory products.

## FACTS RELEVANT TO ALL CLAIMS

### Modelo's Products and Registered Trademarks

8.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 7 as if fully set forth herein.

9.    Plaintiff Modelo produces and sells various brands of beer, including, Corona Extra and Corona Light (hereinafter "Corona Beer").

10.    Plaintiff Marcas Modelo is an affiliate of Modelo and is the authorized licensor of Modelo's registered trademarks in the United States and Canada.

11.    Corona Beer has been imported and sold in the United States since 1943 and today it is the number one selling imported beer in the United States. Corona Beer is sold and served throughout the United States, including in bars, restaurants, supermarkets, grocery and convenience stores, and at other retail locations. In 2006, Modelo sold over 136.2 million cases of Corona Beer in the United States.

12.    Modelo has used the trademark Corona in a distinctive Old English typeface on the bottles and packaging for Corona Beer in the United States continuously since 1943. Modelo has also long used a distinctive CROWN DESIGN as well as the phrase "LA CERVEZA MAS

- 3 -

FINA" on the bottles and packaging for Corona Beer. Modelo has also long used a distinctive blue and gold color combination on the packaging for Corona Beer and a distinctive painted label design on its bottles consisting of the colors blue and white and, when the bottle is full, the color gold (the color of the beer).

13.     Modelo and its importing companies spend many millions of dollars a year to advertise and promote Corona Beer, including in media such as television, radio, newspapers and magazines, and in stores, bars and restaurants. In addition, Corona sponsors many special events.

14.     As a result of the great success of Corona Beer and the vast advertising and promotional efforts and expenditures undertaken by Modelo, the Corona Trademarks have come to symbolize extraordinary goodwill and have achieved great fame throughout the United States and the world.

15.     In recognition of the valuable rights in the various Corona Beer trademarks, the United States Patent and Trademark Office has granted numerous trademark registrations to Modelo for beer, including the following trademarks: CORONA (Stylized), U.S. Reg. No. 1,681,366; CORONA EXTRA (Stylized), U.S. Reg. No. 1,681,365; CORONA & Design, U.S. Reg. No. 1,689,218; CORONA EXTRA LA CERVEZA MAS FINA & Design, U.S. Reg. No. 1,729,694; and LA CERVEZA MAS FINA & Design, U.S. Reg. No. 1,495,289. These registrations are valid, subsisting and incontestable pursuant to 15 U.S.C. § 1065. Copies of these registrations are attached hereto as Exhibit A.

16.     The fame and popularity of Corona Beer and the Corona trademarks has generated very strong consumer demand for products that contain or display the Corona Beer trademarks. Among these many different products are clothing, including, sweatshirts, t-shirts,

golf and tennis shirts, jackets, hats, caps, sun visors, socks, shorts, bags, and flip-flops (collectively "Corona Clothing").

17.    Modelo has obtained a number of United States trademark registrations for trademarks for Corona Clothing, including CORONA (Stylized), U.S. Reg. No. 2,489,710; CORONA EXTRA (Stylized), U.S. Reg. No., 2,489,711; CORONA & Design, U.S. Reg. No. 2,489,709; CORONA EXTRA LA CERVEZA MAS FINA & Design, U.S. Reg. No. 2,489,708; and LA CERVEZA MAS FINA & Design, U.S. Reg. No. 1,828,343 (collectively, the "Corona Trademarks"). These registrations are valid, subsisting and fully enforceable. Copies of these registrations are attached hereto as Exhibit B.

18.    Modelo permits certain companies to manufacture and sell products including the Corona Clothing products through licensing arrangements. Modelo has granted to plaintiff Marcas Modelo the sole and exclusive right to license the Corona Trademarks in the United States and Canada. Each licensee must enter into a written license agreement with Marcas Modelo which, among other things, sets forth the specific goods that are subject to the license and the terms and conditions of the license.

19.    In order to protect the goodwill and reputation of the Corona brand and trademarks, each proposed design that a licensee intends to use on a licensed product must be submitted to Marcas Modelo for review and approval. In addition, a sample of each proposed licensed product must be submitted to Marcas Modelo for quality inspection and approval before the product can be sold by the licensee.

### The License Agreement Between Marcas Modelo and Concept One

20.    On January 1, 2007, Marcas Modelo and Concept One entered into a license agreement (the "Concept One License Agreement"), whereby Marcas Modelo granted to

Concept One a limited, non-exclusive authorization and license to use certain of Modelo's trademarks, including the Corona Trademarks, in the manufacture, sale and distribution of certain products in the United States. The term of the Concept One License Agreement was from January 1, 2007 through December 31, 2007. A copy of the Concept One License Agreement is attached hereto as Exhibit C.

21.     Pursuant to the Concept One License Agreement, Concept One was licensed to use the Corona Trademarks on hats, headware, beanies, umbrellas, flip-flops and t-shirts (the "Licensed Products").

22.     The Concept One License Agreement states that "[n]o License is granted hereunder for the use of the SUBJECT MARKS for any purpose other than upon or in connection with the LICENSED PRODUCTS." (Ex. C § 2.2.)

23.     Concept One agreed in the Concept One License Agreement that the Licensed Products would conform to the standards and specifications designated by Marcas Modelo. (Id. § 3.1.)

24.     Concept One also agreed to submit, prior to the manufacture or sale of Licensed Products, two samples of each of the Licensed Products in the form proposed for sale and distribution, as well as samples of all packaging, promotional and advertising materials, for approval by Marcas Modelo. (Id. § 3.2.)

25.     Concept One expressly recognized the great value of the goodwill associated with the Corona Trademarks and was prohibited from using the marks for any products or services except as expressly authorized under the Concept One License Agreement. (Id. § 6.6.)

26.     Concept One expressly acknowledged that its breach of the Concept One License Agreement would result in immediate and irreparable damage to Marcas Modelo, for which

money damages alone would be inadequate to compensate Marcas Modelo. Concept One agreed that in the event of its breach of the Concept One License Agreement, Marcas Modelo may, in addition to all other remedies, immediately obtain injunctive relief prohibiting such breach or compelling specific performance. (Id. § 12.1.)

27.    Concept One was required upon termination of the Concept One License Agreement to immediately discontinue the manufacture of any product bearing the Corona Trademarks and to cease all other use of the Corona Trademarks. (Id. § 11.1.)

28.    Concept One had the right to dispose of its existing stock of Licensed Products for a period of three months following termination of the Concept One License Agreement, if, within fifteen days after termination, Concept One (a) paid to Marcas Modelo all royalties accrued up to the time of termination, (b) delivered to Marcas Modelo a report of sales up to the time of termination, and (c) provided Marcas Modelo with a written report of defendant's inventory of each of the unsold Licensed Products. (Id.)

### Concept One's Unlawful Conduct

29.    Upon information and belief, Concept One is well aware of and, since prior to the acts complained of herein, has been well aware of the vast goodwill represented and symbolized by the Corona brand and by the Corona Trademarks.

30.    Upon information and belief, Concept One has disregarded its obligations under the Concept One License Agreement and has caused to be manufactured and imported for sale in the United States numerous products that contain the Corona Trademarks without the approval and/or authorization of Marcas Modelo.

31.    Upon information and belief, Concept One has been selling products bearing designs that were never approved by Marcas Modelo pursuant to Section 3 of the Concept One

License Agreement.  Photographs of exemplary products bearing unapproved designs are attached hereto as Exhibit D.

32.     In addition, upon information and belief, Concept One has been, and, is continuing to advertise and sell products containing the Corona Trademarks for which it did not ever have the consent, license or permission of Modelo or Marcas Modelo to sell, in violation of the Concept One License Agreement.

33.     Concept One was not authorized or licensed under the Concept One License Agreement to sell bags, backpacks or totes bearing the Corona Trademarks.

34.     Concept One was fully aware that it had no authorization or permission from Marcas Modelo to sell bags, bag packs or totes bearing the Corona Trademarks.  Concept One had requested that bags be added to its schedule of Licensed Products.  Marcas Modelo informed Concept One by letter dated March 21, 2007 that it would not add bags to its schedule of Licensed Products.  A copy of the March 21, 2007 letter is attached hereto as Exhibit E.

35.     Upon information and belief, notwithstanding that Concept One was aware that it had no authorization or permission from Marcas Modelo to sell bags, backpacks or totes bearing the Corona Trademarks, Concept One willfully and deliberately sold such products in violation of the Concept One License Agreement and in derogation of Plaintiffs' trademarks rights.

36.     Upon information and belief, Defendant Concept One has distributed and sold the unauthorized bags, backpacks and totes to various retailers throughout the United States.

37.     Concept One also advertises the unauthorized bags on its website (www.concept1.com) and states that "bags" have been one of its "strongest selling product (sic) for the past two years."  A printout showing the unauthorized bags from Concept One's website is attached hereto as Exhibit F.

38.     Defendant's unauthorized use of the Corona Trademarks has caused Plaintiffs to lose the ability to control their reputation and image among the public.

39.     Defendant's actions alleged herein have diluted, tarnished and caused injury to the Corona Trademarks.

40.     Defendant's actions alleged herein are likely to have caused and are likely to continue to cause confusion and deception in the marketplace.

41.     Defendant's actions alleged herein have been likely to cause and are likely to continue to cause the public to believe that Defendant's products possess the same quality and standards as that of products that are officially licensed by Plaintiffs.

42.     Upon information and belief, the foregoing infringing acts of Defendant Concept One were willful and deliberate and were undertaken with the intention to unfairly trade off of the goodwill associated with the Corona Trademarks.

43.     Upon information and belief, the foregoing infringing acts of Defendant Concept One were willful and deliberate and were undertaken with the intention to cause public confusion and deception.

44.     Due to Defendant's blatant infringement of Modelo's licensed trademarks and Concept One's breach of the Concept One License Agreement, Marcas Modelo terminated the Concept One License Agreement by letter dated July 26, 2007. A copy of the July 26, 2007 letter is attached hereto as Exhibit G.

45.     Upon information and belief, Concept One has failed to comply with the termination provisions of the Concept One License Agreement, particularly Section 11, governing licensees' duties upon termination.

46.     Concept One has not complied with any of the requirements of Section 11 of the Concept One License Agreement and is therefore not entitled to a limited sell-off of Licensed Products.

47.     Notwithstanding the foregoing, upon information and belief, Concept One has been, and is continuing to sell unauthorized products that contain the Corona Trademarks.

48.     Upon information and belief, Concept One has over $2,000,000 in inventory of goods bearing the Corona Trademarks.

49.     Upon information and belief, the vast majority of this inventory consists of products bearing the Corona Trademarks that were neither approved nor authorized by Marcas Modelo.

50.     Upon information and belief, Concept One intends to sell and/or has committed to sell and/or is selling its inventory of unapproved and/or unauthorized goods bearing the Corona Trademarks to retailers and mass merchandisers throughout the United States.

## COUNT I

## INFRINGEMENT OF FEDERALLY REGISTERED TRADEMARKS

51.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

52.     Defendant's aforesaid acts constitute use in commerce of reproductions, copies and colorable imitations of Modelo's federally registered Corona Trademark in violation of the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.*, and more particularly, of § 1114(1).

53.     Defendant's aforesaid acts have caused and will continue to cause great and irreparable injury to Plaintiffs, and unless said acts are restrained by this Court, they will be continued and Plaintiffs will continue to suffer great and irreparable injury.

54.     Plaintiffs have no adequate remedy at law.

## COUNT II

### FALSE DESIGNATIONS OF ORIGIN AND FALSE DESCRIPTIONS AND REPRESENTATIONS IN VIOLATION OF SECTION 43(a) OF THE TRADEMARK ACT

55.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

56.     Defendant's aforesaid acts constitute intentional and willful false designations of origin and false representations in violation of Section 43(a) of the Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a).

57.     Defendant's aforesaid acts have caused and will continue to cause great and irreparable injury to Plaintiffs, and unless said acts are restrained by this Court, they will be continued and Plaintiffs will continue to suffer great and irreparable injury.

58.     Plaintiffs have no adequate remedy at law.

## COUNT III

### FALSE ADVERTISING IN VIOLATION OF SECTION 43(a) OF THE TRADEMARK ACT

59.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

60.     Defendant's aforesaid acts constitute false advertising of section 43(a) of the Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a).

61.    Defendant's aforesaid acts have caused and will continue to cause great and irreparable injury to Plaintiffs, and unless said acts are restrained by this Court, they will be continued and Plaintiffs will continue to suffer great and irreparable injury.

62.    Plaintiffs have no adequate remedy at law.

## COUNT IV

## COMMON LAW TRADEMARK INFRINGEMENT

63.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

64.    Defendant's aforesaid acts constitute infringement, imitation and misappropriation of the Corona Trademarks in violation of Plaintiffs' rights under the common law of the State of New York.

65.    Defendant's aforesaid acts have caused and will continue to cause great and irreparable injury to Plaintiffs, and unless said acts are restrained by this Court, they will be continued and Plaintiffs will continue to suffer great and irreparable injury.

66.    Plaintiffs have no adequate remedy at law.

## COUNT V

## COMMON LAW UNFAIR COMPETITION

67.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

68.    Defendant's aforesaid acts constitute intentional and willful unfair competition under the common law of the State of New York.

69.    Defendant's aforesaid acts have caused and will continue to cause great and irreparable injury to Plaintiffs, and unless said acts are restrained by this Court, they will be continued and Plaintiffs will continue to suffer great and irreparable injury.

70.    Plaintiffs have no adequate remedy at law.

## COUNT VI

### INJURY TO BUSINESS REPUTATION AND DILUTION

71.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

72.    Defendant's aforesaid acts constitute injury to business reputation and dilution as said acts have diluted and are likely to continue to dilute the distinctive quality of Modelo's trade names and trademarks in violation of Section 360-*l* of the General Business Law of the State of New York.

73.    Plaintiffs have no adequate remedy at law.

## COUNT VII

### CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES

74.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

75.    Defendant's aforesaid acts constitute deceptive acts and practices in the conduct of trade and commerce in the State of New York in violation of Section 349 of the General Business Law of the State of New York.

76.    Plaintiffs have no adequate remedy at law.

## COUNT VIII

### BREACH OF CONTRACT
(Sale of Unauthorized Products)

77.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

78.    Concept One's aforesaid acts constitute breach of contract in violation of the laws of the State of New York.  Specifically, defendant Concept One has made unauthorized use of the Corona Trademarks on unauthorized products in breach of Section 2.2 of the Concept One License Agreement.

79.    Plaintiff has fully performed its obligations under the contract.

## COUNT IX

### BREACH OF CONTRACT
(Sale of Unapproved Products)

80.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

81.    Concept One's aforesaid acts constitute breach of contract in violation of the laws of the State of New York.  Specifically, defendant Concept One has made unauthorized use of the Corona Trademarks on unapproved products in breach of Section 3.2 of the Concept One License Agreement.

82.    Plaintiff has fully performed its obligations under the contract

WHEREFORE, Plaintiffs hereby pray:

A.    that Defendant Concept One and its suppliers, officers, agents, servants, employees and attorneys and those persons in active concert, privity or participation with them,

or any of them, or any of their successors or assigns, be preliminarily and permanently enjoined and restrained from:

 (1) using in connection with the manufacture, distribution, advertising, promotion, offering for sale or sale of any products, any trademark, work symbol or name which so resembles, copies, imitates or simulates Modelo's CORONA, CORONA EXTRA, CORONA & Design, CORONA EXTRA LA CERVEZA MAS FINA & Design, LA CERVEZA MAS FINA & Design trademarks as to be likely to cause confusion, cause mistake or to deceive;

 (2) using in any manner in connection with the advertising, promotion, marketing, sale, or offer for sale any misleading advertising, false designations of origin, or false representations, or otherwise commit any acts of unfair competition or deceptive or unlawful trade practices, which may cause the trade or public to mistakenly believe that Concept One or its respective products are related to, affiliated, associated or connected with, or sponsored or approved by Plaintiffs;

 (3) doing any other act which may, or is intended, designed, or calculated to injure Plaintiffs' business reputation or dilute, tarnish or disparage the distinctive quality of Modelo's CORONA, CORONA EXTRA, CORONA & Design, CORONA EXTRA LA CERVEZA MAS FINA & Design, LA CERVEZA MAS FINA & Design trademarks;

 B. that Defendant and those controlled by Defendant and those acting for Defendant be required to recall from all of their customers in the trade and to deliver up to the Court for destruction all unauthorized products, labels, signs, prints, packages, wrappers, receptacles,

advertisements and other written or printed material which bear the names CORONA, CORONA EXTRA, CORONA & Design, CORONA EXTRA LA CERVEZA MAS FINA & Design, LA CERVEZA MAS FINA & Design or which bear any other devise, representation or indicia in violation of the injunction herein requested by Plaintiffs, and that Defendant be ordered to deliver up for destruction all plates, molds, matrices, and all other means of making the same;

      C.     that Defendant be directed to file with this Court and serve upon Plaintiffs within 30 days after such service upon such Defendant of this Court's injunction in this action a written report by the Defendant under oath setting forth in detail the manner in which the Defendant has complied with such injunction;

      D.     that Defendant be required to account to Plaintiffs for Defendant's profits from the sales of its unauthorized products that have been advertised, promoted, marketed, sold, offered for sale, or distributed under the trademarks CORONA, CORONA EXTRA, CORONA & Design, CORONA EXTRA LA CERVEZA MAS FINA & Design, LA CERVEZA MAS FINA & Design together with such increased sum in addition thereto as the Court shall find just in view of the willful nature of Defendant's infringing and tortious acts;

      E.     that Plaintiffs recover as their damages arising out of the foregoing acts of trademark infringement, false descriptions and representations, and unfair competition, a sum equal to three times the damages suffered by Plaintiffs;

      F.     that plaintiff Marcas Modelo recover its damages arising out of the foregoing acts constituting breach of contract;

      G.     that Plaintiffs have and recover the taxable costs of this civil action;

      H.     that Plaintiffs have and recover their attorney's fees;

I.    that in view of the Defendant's wanton and deliberate unlawful acts, the Plaintiffs

be awarded punitive damages;

J.    that Plaintiffs have such other and further relief as the Court may deem just and

equitable.

Dated:  New York, New York
        September 12, 2007

                                    Respectfully submitted,

                                    KIRKPATRICK & LOCKHART
                                    PRESTON GATES ELLIS LLP

                                    By: _____
                                        Darren W. Saunders  (DS 0456)
                                        Mark I. Peroff  (MP 6858)
                                        Joanna A. Diakos  (JD 7269)
                                    599 Lexington Avenue
                                    New York, New York 10022
                                    Tel.:  (212) 536-3900
                                    Fax:   (212) 536-3901

                                    *Attorneys for Plaintiffs Cerveceria Modelo,*
                                    *S.A. de C.V. and Marcas Modelo, S.A. de C.V.*

Exhibit A

Int. Cl.: 32

Prior U.S. Cl.: 48

## United States Patent and Trademark Office

Reg. No. 1,681,366
Registered Mar. 31, 1992

### TRADEMARK
### PRINCIPAL REGISTER



CERVECERIA MODELO S.A. DE C.V. (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

FOR: BEER, IN CLASS 32 (U.S. CL. 48).
FIRST USE 8–28–1925; IN COMMERCE 8–25–1943.

OWNER OF U.S. REG. NOS. 662,347, 1,175,418, AND 1,462,155.
THE ENGLISH TRANSLATION OF THE WORD "CORONA" IN THE MARK IS "CROWN".

SER. NO. 73–625,255, FILED 10–14–1986.

CRAIG K. MORRIS, EXAMINING ATTORNEY

Int. Cl.: 32

Prior U.S. Cl.: 48

## United States Patent and Trademark Office

Reg. No. 1,681,365
Registered Mar. 31, 1992

### TRADEMARK
### PRINCIPAL REGISTER



CERVECERIA    MODELO    S.A.    DE    C.V.
 (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

 FOR: BEER, IN CLASS 32 (U.S. CL. 48).
 FIRST  USE  3–27–1969;  IN  COMMERCE
3–27–1969.
 OWNER OF U.S. REG. NOS. 662,347, 1,175,418,
AND 1,462,155.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "EXTRA" , APART FROM THE
MARK AS SHOWN.

 THE  ENGLISH  TRANSLATION  OF  THE
WORD   "CORONA"   IN   THE   MARK   IS
"CROWN".

 SER. NO. 73–625,250, FILED 10–14–1986.

CRAIG K. MORRIS, EXAMINING ATTORNEY

Int. Cl.: 32

Prior U.S. Cl.: 48

**United States Patent and Trademark Office**

Reg. No. 1,689,218
Registered May 26, 1992

## TRADEMARK
### PRINCIPAL REGISTER



CERVECERIA MODELO S.A. DE C.V. (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

FOR: BEER, IN CLASS 32 (U.S. CL. 48).
FIRST USE 3–27–1969; IN COMMERCE 3–27–1969.

OWNER OF U.S. REG. NOS. 662,347, 1,175,418, AND 1,462,155.

THE WORD "CORONA" TRANSLATED INTO ENGLISH MEANS "CROWN".

SER. NO. 73–625,252, FILED 10–14–1986.

CRAIG K. MORRIS, EXAMINING ATTORNEY

Int. Cl.: 32

Prior U.S. Cl.: 48

## United States Patent and Trademark Office

Reg. No. 1,729,694
Registered Nov. 3, 1992

### TRADEMARK
### PRINCIPAL REGISTER





CERVECERIA MODELO S.A. DE C.V. (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

FOR: BEER, IN CLASS 32 (U.S. CL. 48).
FIRST USE 3–27–1969; IN COMMERCE 3–27–1969.
OWNER OF U.S. REG. NOS. 662,347, 1,175,418, AND 1,462,155.
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "EXTRA", AND "LA CER-

VEZA MAS FINA", APART FROM THE MARK AS SHOWN.

THE WORD "CORONA" TRANSLATED INTO ENGLISH MEANS "CROWN". THE WORDS "LA CERVEZA MAS FINA" TRANSLATED INTO ENGLISH MEANS "THE FINEST BEER".

SER. NO. 73–625,248, FILED 10–14–1986.

CRAIG K. MORRIS, EXAMINING ATTORNEY

Int. Cl.: 32

Prior U.S. Cl.: 48

Reg. No. 1,495,289

## United States Patent and Trademark Office

Registered July 5, 1988

### TRADEMARK
### PRINCIPAL REGISTER



CERVECERIA MODELO S.A. DE C.V. (MEXICO CORPORATION)
EDIFICIO PARQUE REFORMO
CAMPOS ELISEOS NO. 400
COLONIA CHAPULTEPEC POLANCO,
MEXICO CITY, MEXICO 11560

FOR: BEER, IN CLASS 32 (U.S. CL. 48).

FIRST USE 3–27–1969; IN COMMERCE 3–27–1969.

OWNER OF U.S. REG. NOS. 662,347, 1,175,418, AND 1,462,155.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LA CERVEZA MAS FINA", APART FROM THE MARK AS SHOWN.

THE MARK CONSISTS OF THE SLOGAN "LA CERVEZA MAS FINA" WITHIN A CIRCLE, THE TOP PORTION OF WHICH IS FLAT. ABOVE THE CIRCLE IS A FANCIFUL CROWN LOCATED BETWEEN TWO FANCIFUL GRIFFINS, EACH OF WHICH FACE THE CROWN.

THE ENGLISH TRANSLATION OF THE WORDS "LA CERVEZA MAS FINA" IN THE MARK IS "THE FINEST BEER".

SER. NO. 625,249, FILED 10–14–1986.

JULIE B. SEYLER, EXAMINING ATTORNEY

Exhibit B

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 2,489,710
Registered Sep. 18, 2001

### TRADEMARK
### PRINCIPAL REGISTER



CERVECERIA MODELO, S.A. DE C.V. (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

FOR: CLOTHING; NAMELY, SWEATSHIRTS, T-SHIRTS, GOLF AND TENNIS SHIRTS, JACKETS, HATS, CAPS, SUN VISORS, SOCKS, SHORTS, AND BATHING SUITS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 4-1-1980; IN COMMERCE 4-1-1980.

OWNER OF U.S. REG. NOS. 662,347, 1,548,371 AND OTHERS.

THE ENGLISH TRANSLATION OF THE WORD "CORONA" IN THE MARK IS "CROWN".

SER. NO. 74-337,257, FILED 12-7-1992.

MICHAEL BAIRD, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 2,489,711
Registered Sep. 18, 2001

### TRADEMARK
### PRINCIPAL REGISTER



CERVECERIA MODELO, S.A. DE C.V. (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

FOR: CLOTHING; NAMELY, SWEATSHIRTS, T-SHIRTS, GOLF AND TENNIS SHIRTS, JACKETS, HATS, CAPS, SUN VISORS, SOCKS, SHORTS, AND BATHING SUITS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 4-1-1980; IN COMMERCE 4-1-1980.

OWNER OF U.S. REG. NOS. 662,347, 1,548,371 AND OTHERS.

THE ENGLISH TRANSLATION OF THE WORD "CORONA" IN THE MARK IS "CROWN".

SER. NO. 74-337,259, FILED 12-7-1992.

MICHAEL BAIRD, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cl.: 39

**United States Patent and Trademark Office**

Reg. No. 2,489,709
Registered Sep. 18, 2001

## TRADEMARK
### PRINCIPAL REGISTER



CERVECERIA MODELO, S.A. DE C.V. (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

FOR: CLOTHING; NAMELY, SWEATSHIRTS, T-SHIRTS, GOLF AND TENNIS SHIRTS, JACKETS, HATS, CAPS, SUN VISORS, SOCKS, SHORTS, AND BATHING SUITS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 4-1-1980; IN COMMERCE 4-1-1980.

OWNER OF U.S. REG. NOS. 662,347, 1,548,371 AND OTHERS.

THE ENGLISH TRANSLATION OF THE MARK DEFINES THE WORD "CORONA" AS "CROWN".

SER. NO. 74-337,256, FILED 12-7-1992.

MICHAEL BAIRD, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 2,489,708
Registered Sep. 18, 2001

## TRADEMARK
### PRINCIPAL REGISTER





CERVECERIA MODELO, S.A. DE C.V. (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

FOR: CLOTHING; NAMELY, SWEATSHIRTS, T-SHIRTS, GOLF AND TENNIS SHIRTS, JACKETS, HATS, CAPS, SUN VISORS, SOCKS, SHORTS, AND BATHING SUITS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 4-1-1980; IN COMMERCE 4-1-1980.

OWNER OF U.S. REG. NOS. 662,347, 1,548,371 AND OTHERS.

THE ENGLISH TRANSLATION OF THE WORD "CORONA" IN THE MARK IS "CROWN".

SER. NO. 74-337,255, FILED 12-7-1992.

MICHAEL BAIRD, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 1,828,343
Registered Mar. 29, 1994

## TRADEMARK
## PRINCIPAL REGISTER



CERVECERIA MODELO, S.A. DE C.V. (MEXICO CORPORATION)
LAGO ALBERTO NO. 156
COL. ANAHUAC
11320 MEXICO, D.F., MEXICO

FOR: CLOTHING; NAMELY, SWEATSHIRTS, T-SHIRTS, GOLF AND TENNIS SHIRTS, JACKETS, HATS, CAPS, SUN VISORS, SOCKS, SHORTS, AND BATHING SUITS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 4–1–1980; IN COMMERCE 4–1–1980.

OWNER OF U.S. REG. NOS. 1,462,155, 1,548,371 AND OTHERS.

THE ENGLISH TRANSLATION OF THE WORDS "LA CERVEZA MAS FINA" IS "THE FINEST BEER".

SER. NO. 74–337,258, FILED 12–7–1992.

JOAN LESLIE BISHOP, EXAMINING ATTORNEY

Exhibit C

# LICENSE AGREEMENT

Marcas Modelo, S.A. de C.V. a Mexican *Sociedad Anonima de Capital Variable* corporation (hereinafter "LICENSOR"), and Concept One Accessories a New York Corporation(hereinafter "LICENSEE"), agree as follows:

1.     Definitions

1.1     "SUBJECT MARKS" means the trademarks and related designs shown in Exhibit A and any other marks or designs incorporating any of those trademarks.

1.2     "LICENSED PRODUCTS" means any product or part thereof listed in Exhibit B.

1.3     "TERRITORY" means the United States of America and its possessions, but not including Puerto Rico or the Virgin Islands.

1.4     "NET SALES PRICE" means LICENSEE's gross sales price for LICENSED PRODUCTS less actual quantity discounts and returns. No deduction shall be made for cash payments, uncollectible accounts or other discounts. Viable proof of uncollectible accounts or other discounts shall be provided to LICENSOR. No costs incurred in the manufacture, sale, distribution or promotion of the LICENSED PRODUCTS shall be deducted in computing NET SALES PRICE.

1.5     "PARTY" means either, and "PARTIES" means both, of LICENSOR and LICENSEE.

2.     Grant of License

2.1     Subject to the terms of this Agreement, LICENSOR hereby grants LICENSEE a limited, revocable, non-exclusive authorization and license to use the SUBJECT MARKS in the manufacture, sale and distribution of the LICENSED PRODUCTS in the TERRITORY, but only in such form and manner as approved in advance by LICENSOR under Section 3 of this Agreement.

2.2     No License is granted hereunder for the use of the SUBJECT MARKS for any purpose other than upon or in connection with the LICENSED PRODUCTS. No license is granted to LICENSEE hereunder for the manufacture, sale or distribution of LICENSED PRODUCTS to be used as a premium. "Premium" means any product given free or sold at less than its customary selling price for the purpose of increasing the sale, promotion, or publicizing of any other product or any service, including incentives for sales force, trade or consumers. LICENSEE shall not use any of the SUBJECT MARKS in connection with any sweepstakes,

1

lottery, game of chance or any similar promotional or sales device, scheme, or program. In the event LICENSEE desires to sell LICENSED PRODUCTS for such purposes, LICENSEE agrees to obtain, in advance, express written approval to do so from LICENSOR.

3.    Quality Standards and Approval

3.1    LICENSEE agrees that the LICENSED PRODUCTS shall conform to such standards and specifications as may be designated from time to time by LICENSOR. LICENSOR may change such standards and specifications upon notice to LICENSEE. The standards and specifications designated by LICENSOR, and any additions or amendments thereto, shall become effective thirty days after written notice of such standards and specifications to LICENSEE, and all LICENSED PRODUCTS manufactured by or for LICENSEE after that date shall conform to such standards and specifications unless otherwise agreed in writing by LICENSOR.

3.2    For each LICENSED PRODUCT bearing any of the SUBJECT MARKS proposed by LICENSEE under this Agreement, LICENSEE shall submit in advance, to LICENSOR for approval two samples of the LICENSED PRODUCT in the form proposed for sale and distribution by LICENSEE, as well as samples of all packaging, promotional and advertising materials. Each product submitted by LICENSEE for approval shall be accompanied by photographs or drawings in duplicate, approximately 8 X 10 inches in size, which clearly and accurately display all designs and text appearing on the LICENSED PRODUCT. If LICENSOR approves a proposed design of a LICENSED PRODUCT, LICENSOR will give notice of approval to LICENSEE by stamping the photographs or drawings of approved designs and returning one set of the proposed duplicate photographs or drawings to LICENSEE. Unless a proposed design is approved in this manner or is otherwise specifically approved in writing by LICENSOR, the design shall be deemed disapproved. No LICENSED PRODUCT bearing any of the SUBJECT MARKS shall be used, displayed, advertised, offered for sale, sold, or otherwise distributed by LICENSEE unless and until it has been approved by LICENSOR as provided herein. Approval or disapproval of any LICENSED PRODUCT or design shall be in the absolute discretion of LICENSOR.

3.3    The approval of any LICENSED PRODUCT by LICENSOR under Section 3.2 shall not be deemed to constitute the approval of any deviation from the standards and specifications for LICENSED PRODUCTS established by LICENSOR unless the sample submitted by LICENSEE is accompanied by a written statement disclosing the nature of the deviation and the deviation is specifically approved in writing by LICENSOR in addition to the approval of the design of the LICENSED PRODUCT under Section 3.2. The failure of the LICENSEE to disclose in writing a deviation from LICENSOR's standards and specifications shall nullify any approval of that LICENSED PRODUCT by LICENSOR, which shall be deemed void from the outset and of no effect.

3.4    LICENSOR from time to time may amend the procedure for submission and approval of new designs by giving written notice of such amendment to LICENSEE.

2

3.5     After approval by LICENSOR, LICENSEE shall not change the design or quality of any LICENSED PRODUCT, or the appearance or manner of use of a SUBJECT MARK, without the prior written approval of LICENSOR. In the event the LICENSEE creates a new trademark or design through a change in the appearance of a SUBJECT MARK, the new trademark or design shall be the exclusive property of the LICENSOR, and LICENSEE's usage thereof shall be subject to the same terms and conditions imposed on the usage of all other SUBJECT MARKS under the terms of this Agreement.

3.6     LICENSEE agrees that all LICENSED PRODUCTS sold or distributed by LICENSEE will be the same as, or substantially identical in quality and appearance to, the initial sample approved by LICENSOR. LICENSEE shall maintain reasonable manufacturing, servicing and quality standards to insure that the LICENSED PRODUCTS are consistent with such initial samples. During the term of this Agreement (including the period provided in Section 11 for disposition of inventory following termination of this Agreement), upon prior notice to LICENSEE given by LICENSOR, the duly authorized representatives of LICENSOR shall have the right to inspect the premises of LICENSEE and its operations and inventory during all hours of operations to insure that standards of quality and consistency with approved samples of LICENSED PRODUCTS are being maintained. At the request of LICENSOR from time to time, LICENSEE shall submit to LICENSOR representative current samples and photographs of the LICENSED PRODUCTS which LICENSEE is manufacturing, selling, or distributing.

4.     Royalty

4.1     LICENSEE agrees to pay LICENSOR **Eight (8) percent (%)** of the NET SALES PRICE for each LICENSED PRODUCT bearing any of the SUBJECT MARKS sold or otherwise distributed directly by LICENSEE to retailers during the term of this Agreement. If LICENSEE sells or distributes LICENSED PRODUCTS bearing any of the SUBJECT MARKS to beer wholesalers, LICENSEE shall not be required to pay a royalty to LICENSOR. If LICENSEE sells or distributes LICENSED PRODUCTS bearing any of the SUBJECT MARKS to wholesalers, or other intermediate distributors of products, other than beer, who then resell the LICENSED PRODUCT at the retail level, LICENSEE shall pay to LICENSOR a royalty of **Sixteen percent (16%)** of the NET SALES PRICE on such sales. If LICENSEE at any time pays any other licensor a higher royalty rate or licensing rate than that provided in this Agreement for use in the TERRITORY of any name, mark, slogan or likeness on the same or similar product, LICENSEE shall immediately notify LICENSOR of such rate, and that higher rate shall automatically and immediately apply to this Agreement.

4.2     LICENSEE agrees that it will use its best efforts in connection with sales of the LICENSED PRODUCTS hereunder.

4.3     Royalties on sales made during each calendar month shall be paid within fifteen days following the end of that month, i.e., by the fifteenth day of the following month.

4.4     The initial term of this Agreement shall be a period commencing on **January 1st, 2007 (the "Effective Date") and renewable on a calendar year basis thereafter.**

3

**LICENSEE shall pay LICENSOR an Advance Minimum Royalty of $ 20,000 ( Twenty Thousand Dollars USD).** Monthly royalties received by LICENSOR under Section 4.1 of this Agreement shall be credited against the Annual Minimum Royalty for the year in which such monthly royalties are earned. Any balance due on the Annual Minimum Royalty shall be paid within thirty days following the end of each calendar year.  To the extent  that the term of this Agreement includes one or more partial calendar years, the Annual Minimum Royalty for such calendar year shall be prorated on a daily basis.  Any balance due on the Annual Minimum Royalty upon termination of this Agreement shall be paid within thirty days following the termination of the Agreement.

4.5    If any royalty payment described in Sections 4.1 through 4.4 of this Agreement is not made within the specified time limit, same shall bear interest until paid at the rate of the lower of (a) fifteen  percent (%) per year or (b) the maximum legal rate applicable.

4.6    If it becomes necessary for LICENSOR to undertake legal action to collect any sum due under this Agreement, LICENSEE shall pay all reasonable legal fees and costs incurred by LICENSOR in connection therewith provided such legal action results in a determination that such sum was due LICENSOR.

5.    Accounts and Reporting

5.1    Each royalty payment made by LICENSEE under Section 4 of this Agreement shall be accompanied by a *written sales report* certified to be accurate by a financial officer of LICENSEE showing the total royalties due to LICENSOR.  In addition, the report shall contain an itemized breakdown showing separately each type of LICENSED PRODUCT sold or distributed by LICENSEE: (i) the number sold or distributed at each royalty rate; (ii) the gross sales price(s) at each royalty rate; (iii) any deductions from the gross sales price(s) claimed by LICENSEE; (iv) the NET SALES PRICE at each royalty rate; and (v) the royalties due LICENSOR under this Agreement. The sales report shall be in the format specified by LICENSOR.

5.2    LICENSEE shall keep accurate accounts showing the manufacture and sale or other distribution of LICENSED PRODUCTS by LICENSEE.  Such accounts shall be maintained for at least three years after the payment of the corresponding royalty and shall be available for inspection by duly authorized representatives of LICENSOR during normal business hours.

5.3    LICENSOR shall have the right to apply all generally accepted auditing standards and procedures to verify the accuracy of LICENSEE's records with respect to the manufacture, sale and distribution of LICENSED PRODUCTS covered by this Agreement. Such audit will be conducted at the sole expense of LICENSOR.

4

6.     **Use of SUBJECT MARKS**

6.1     LICENSEE shall not state or imply, directly or indirectly, that LICENSEE or LICENSEE's activities are supported, endorsed or sponsored by LICENSOR. LICENSEE shall not use the name of LICENSOR, including, without limitation, its corporate or trade name, in the business or affairs of LICENSEE except as designated by LICENSOR pursuant to Section 6.4 of this Agreement.   LICENSEE shall not use any of the SUBJECT MARKS in the business or affairs of LICENSEE except as expressly authorized in this Agreement and approved in advance in writing by LICENSOR as to the form and manner of use pursuant to Section 3 of this Agreement.

6.2     LICENSEE shall not alter, modify, dilute or otherwise misuse the SUBJECT MARKS or bring them into disrepute, and LICENSEE shall not add any words, denominations, or other graphic elements or symbols to the SUBJECT MARKS unless approved in advance in writing by LICENSOR pursuant to Section 3 of this Agreement.

6.3     LICENSEE shall not use any trademark, service mark, trade name, logo, symbol or device other than the SUBJECT MARKS in connection with any of the LICENSED PRODUCTS without the prior written consent of LICENSOR; provided however, that LICENSEE shall affix a tag, label, imprint, or other devise to each LICENSED PRODUCT in such form, manner, location and size as approved in advance in writing by LICENSOR identifying LICENSEE as the manufacturer and distributor of such product.

6.4     LICENSEE shall affix a tag, label, imprint or other appropriate device to each LICENSED PRODUCT in such form, manner, location and size as directed by LICENSOR bearing such copyright, trademark, service mark, or other propriety notices as LICENSOR may from time to time designate.

6.5     At the request of LICENSOR, LICENSEE shall remove from any advertisement, marketing material, product or product package bearing the SUBJECT MARKS any element which LICENSOR, in the exercise of LICENSOR'S sole discretion believe will in any way harm the SUBJECT MARKS or the reputation of LICENSOR.

6.6     LICENSEE recognizes the great value of the goodwill associated with the SUBJECT MARKS, and LICENSEE acknowledges that such goodwill is owned exclusively by LICENSOR and that any and all use of the SUBJECT MARKS by LICENSEE inures solely to the benefit of LICENSOR.   LICENSEE acknowledges the validity of the SUBJECT MARKS and of this License Agreement, as well as LICENSEE's exclusive right, title and interest in and to the SUBJECT MARKS as applied to the LICENSED PRODUCTS under all applicable trademark, copyright, intellectual property and unfair competition laws. LICENSEE shall not in any manner represent or claim that LICENSEE has any ownership interest in the SUBJECT MARKS or in any registration thereof, and shall not knowingly in any way do or cause to be done, or assist others in doing or causing to be done, any act or thing contesting or in any way impairing LICENSOR's right, title and interest in and to the SUBJECT MARKS or the validity of this License Agreement.   LICENSEE acknowledges that, except for the right licensed by this

5

Agreement, LICENSEE has no interest in any of the SUBJECT MARKS, and further agrees not to register or attempt to register in any territory any of the SUBJECT MARKS for any products or services, and not to use the SUBJECT MARKS for any products or service in any territory except as expressly licensed under this Agreement.

      6.7    LICENSEE acknowledges that it shall not market, sell or distribute directly or indirectly the LICENSED PRODUCTS to toy stores or stores whose merchandise appeals primarily to persons below the legal purchase age for alcohol beverages.

      6.8    LICENSEE acknowledges that it shall not market, sell or distribute the LICENSED PRODUCTS through licensee's website, unless written and prior approval has been granted by LICENSOR.

7.    <u>Indemnification</u>

      7.1    LICENSOR assumes no liability to LICENSEE or to third parties with respect to the quality or use of the LICENSED PRODUCTS manufactured, sold or otherwise distributed by LICENSEE. LICENSEE agrees to indemnify and hold harmless LICENSOR, its officers, employees and agents from any and all claims, demands, actions, causes of actions, suits, proceedings, damages, liabilities and costs and expenses of every nature, including attorney's fees, relating to or arising out of the manufacture, sale or distribution of the LICENSED PRODUCTS pursuant to this Agreement or from the use of the LICENSED PRODUCTS so manufactured, sold or distributed.

      7.2    LICENSOR makes no representations or warranties concerning the use of the SUBJECT MARKS in connection with the LICENSED PRODUCTS, and LICENSOR assumes no liability with respect to LICENSEE's use of the SUBJECT MARKS.

8.    <u>Insurance</u>

      8.1    During the term of this Agreement, LICENSEE shall maintain in effect insurance for bodily injury and property damage including product liability, in per occurrence limits of not less than **$1,000,000.00.** Such insurance shall cover claims for damages of any kind arising out of the manufacture, sale, distribution, or use of the LICENSED PRODUCTS, regardless of when such claims are made or when the underlying injuries occur or manifest themselves. Each policy of such insurance shall name LICENSOR as an additional insured, shall provide for waiver of subrogation against LICENSOR and shall provide that notice shall be given to LICENSOR at least thirty days prior to cancellation or material change in the form of such policy. LICENSEE shall deliver certificates evidencing such insurance to LICENSOR within fifteen days after signing this Agreement, and LICENSEE shall not sell or otherwise distribute any LICENSED PRODUCTS until such insurance coverage is in effect.

9.    Term and Termination

9.1    Unless sooner terminated as provided in this Section 9, the term of this Agreement shall be from the Effective Date through **December 31st, 2007.**

9.2    After one year from the effective date of this Agreement set forth below, the Agreement may be terminated at any time by either Party without cause on sixty days, advance written notice to the other Party.

9.3    Should LICENSEE fail to comply with any provision of this Agreement, LICENSOR may terminate this Agreement on thirty days' advance written notice to LICENSEE; provided, that such termination shall be void if LICENSEE corrects such failure to the satisfaction of LICENSOR during the thirty day notice period.

10.    Effects of Termination

10.1    Termination of this Agreement shall not impair any accrued rights of LICENSOR.

10.2    Upon termination of this Agreement, all rights granted to LICENSEE under this Agreement shall revert to LICENSOR, and LICENSEE shall make no claim to such rights.

11.    LICENSEE'S Duties upon Termination.

11.1    Upon the termination of this Agreement, LICENSEE shall immediately discontinue (a) the manufacture of any product bearing the SUBJECT MARKS, and (b) any other use of the SUBJECT MARKS; provided, that, subject to full compliance with the terms of this paragraph, for a period of three months after such termination LICENSEE shall have the right to dispose of its then existing stock of LICENSED PRODUCTS bearing the SUBJECT MARKS in the ordinary course of business at LICENSEE'S normal NET SALES PRICE. Such disposition shall be subject to the terms of this Agreement including, but not limited to, those requiring the reporting of sales and payment of royalties. LICENSEE shall be subject to the terms of this Agreement including, but not limited to, those requiring the reporting of sales and payment of royalties. Within thirty (30) days after the termination of such period, LICENSEE shall destroy all unsold LICENSED PRODUCTS bearing the SUBJECT MARKS and shall certify in writing to LICENSOR the number of each destroyed. Notwithstanding the foregoing provision, LICENSEE's rights to dispose of its stock after termination of this Agreement is subject to the condition that within fifteen days after such termination (a) shall pay to LICENSOR all royalties accrued to the time of termination, (b) shall deliver to LICENSOR a report of sales up to the time of termination in the form required by Section 5.1 of this Agreement, (c) shall provide LICENSOR with a written report of LICENSEE's remaining inventory of each of the unsold LICENSED PRODUCTS bearing SUBJECT MARKS, and (d) shall allow LICENSOR to conduct a physical inventory to verify such report.

7

12.    Remedies

12.1    LICENSEE acknowledges that its breach of this Agreement will result in immediate and irreparable damage to LICENSOR, for which money damages alone would be inadequate to compensate LICENSOR. Therefore, in the event of a breach or threatened breach of any provision of this Agreement by LICENSEE, LICENSOR may, in addition to all other remedies, immediately obtain   and enforce injunctive relief prohibiting such breach or compelling specific performance of such provision.

12.2    In the event that LICENSOR prevails, in whole or in part, in any action by or against LICENSEE or anyone in privity with LICENSEE arising out of or relating to this Agreement, LICENSOR shall be entitled to recover its costs and its reasonable attorney's fees.

13.    Confidentiality

13.1    All information contained in this Agreement and any and all information acquired by LICENSEE as a result of the license granted herein is and shall remain confidential. LICENSEE shall not disclose any of the aforementioned information, directly or indirectly, not use it in any way, either during the term of this Agreement or at any time thereafter, except as permitted under the terms of this Agreement. LICENSEE acknowledges that the terms of Section 12.2 are fully applicable to this paragraph.

14.    Severability

14.1    In the event any provision of this Agreement is determined to be unenforceable under or in conflict with the law of any applicable jurisdiction, such provision shall be deemed omitted from this Agreement, but the validity and enforceability of the remaining provisions shall not be affected by such deemed omission.

15.    Modification and Waiver

15.1    This Agreement may be amended only in writing signed by both Parties.

15.2    No waiver by either Party of the breach of any provision of this Agreement shall be deemed a waiver of any continuing or subsequent breach of that provision or of any other provision.

16.    Assignability

16.1    This Agreement shall inure to the benefit of LICENSOR, its successors and assigns, and may not be assigned by LICENSEE without the prior written consent of LICENSOR. LICENSOR shall have no obligation to grant such consent.

16.2    LICENSEE has no right to sublicense any of the rights granted under this Agreement.

8

17.    Governing Law

17.1    This Agreement shall be governed by the laws of the State of New York, U.S.A. Each party hereby agrees to the jurisdiction and venue of the courts of the State of New York, for the litigation or resolution of any dispute between the parties pertaining to this Agreement.


18.    Notices and Payments

18.1    Any notice, payment or other communication required by this Agreement, shall be deemed to have been properly given on the date of delivery if made in writing in the English language, and actually delivered (whether by first class mail, facsimile with confirmation, overnight courier, personal delivery or otherwise) to the corresponding address given below, or such other address as may be designated from time to time by either party by notice so given:

TO LICENSOR:

General Counsel Office
Av. Javier Barros Sierra No. 555-6 Piso
Col. Zedec Santa Fe
México, D.F. CP 01210



TO LICENSEE:
Mr. Bernie Hafif
Concept One Accessories
362 Fifth Avenue 2nd Floor
New York, NY 10001



19.    No Joint Venture

19.1    This Agreement shall not constitute (a) a partnership or joint venture between LICENSOR and LICENSEE, (b) a franchise agreement between LICENSOR and LICENSEE, or (c) any legal relationship other than Licensor/Licensee. LICENSEE shall have no right to obligate or bind LICENSOR in any manner whatsoever, and nothing contained in this agreement shall give LICENSEE any right of agency or representation of LICENSOR vis-a-vis third persons.

9

20.    Entire Agreement

20.1    This Agreement contains the entire agreement between the Parties with regard to the subject matter hereof and supersedes all other statements, representations and agreements pertaining to such subject matter.

IN WITNESS WHEREOF, the Parties have signed this Agreement to be effective as of **January 1st,2007.**

**MARCAS MODELO, S.A. DE C.V.**

By: _____

Juan Fernandez

Concept One Accessories

By: _____

Mr. Bernie Hanif CFO

10

**EXHIBIT A**

CORONA
CORONA AND DESIGN


CORONA EXTRA
CORONA EXTRA AND DESIGN


CORONITA EXTRA
CORONITA EXTRA AND DESIGN


CORONA LIGHT
CORONA LIGHT AND DESIGN



MODELO
MODELO AND DESIGN


MODELO ESPECIAL
MODELO ESPECIAL AND DESIGN

NEGRA MODELO
NEGRA MODELO AND DESIGN


PACIFICO
PACIFICO AND DESIGN

11

**EXHIBIT B**
**Hats, Headware, Beanies, Umbrellas**

*******************************************************************

*Flip-Flops, T-shirts*

Exhibit D





HANGTAG#

**COT003**

LABEL#

**COT004**




HANGTAG#

**COT003**

LABEL#

**COT004**



HANGTAG#

**COT003**

LABEL#

**COT004**



HANGTAG#

**COT003**

LABEL#

**COT004**

Exhibit E

# GModelo USA

9830 Colonnade Blvd. Suite 300, San Antonio, Texas 78230
TEL. (210) 341-2172  Fax (210) 341-1960



March 21, 2007

VIA EMAIL

Concept One
Sam Hafif
362 Fifth Avenue, 2nd Floor
New York, NY  10001

Re:    Request for new category/ Concept One Accessories.

Dear Sam,

I'm writing you on behalf of Marcas Modelo S.A. de C.V. to inform you on regards to your request to add the category of *Bags* to your current agreement. At this time Marcas Modelo S.A. de C.V is not adding new categories to their 2007 agreements.

Please do not hesitate to contact me if you have any further questions regarding this matter

Sincerely,

Juan Fernandez

Exhibit F



Exhibit G

**K&L|GATES**

Kirkpatrick & Lockhart Preston Gates Ellis LLP
599 Lexington Avenue
New York, NY 10022-6030

T 212.536.3900    www.klgates.com

July 26, 2007

Darren W. Saunders
D 212.536.3952
F 212.536.3901
darren.saunders@klgates.com

<u>**Via Federal Express**</u>
Mr. Bernie Hafif
Chief Financial Officer
Concept One Accessories
362 Fifth Avenue, 2nd Floor
New York, New York 10001

Re:    <u>Marcas Modelo/Concept One License Agreement</u>

Dear Mr. Hafif:

We are legal counsel to Marcas Modelo, S.A. de C.V. ("Marcas Modelo") in intellectual property matters. We are writing in regard to your license agreement with Marcas Modelo, dated January 1, 2007 ("License Agreement").

It has recently come to Marcas Modelo's attention that Concept One has been distributing and selling Corona-branded merchandise, including, without limitation, bags, backpacks, and totes that are not authorized by Concept One's License Agreement. Concept One's distribution and sale of unauthorized Corona-branded products, violates Sections 2 and 6 of its License Agreement and constitutes trademark infringement and unfair competition under Federal and New York common law, <u>see</u> 15 U.S.C. § 1051 <u>et seq.</u>, and deceptive business practices under N.Y.G.B.L § 349.

In addition to selling unlicensed products, Marcas Modelo has recently learned that your company has been selling products bearing designs that have not been approved by Marcas Modelo pursuant to Section 3 of the License Agreement. For example, the designs on the following products were not approved by Marcas Modelo: CO2081MV, CO2081S, CO2081TG, CO2081WC, CO2081WM, CO6066, CO6064W, CO6057W. Your company is prohibited from selling any products that bear a design that has not been approved by Marcas Modelo. These activities constitute a breach of your company's obligations under the License Agreement.

Further, according to the royalty reports forwarded to Marcas Modelo by your company, it appears that Concept One has been selling off products from its 2006 license agreement with Procermex, Inc. after the permitted sell-off period. Under the Procermex License Agreement, Concept One was permitted to sell-off Licensed Products that <u>were in</u>

NY-539771 v2

# K&L|GATES

Mr. Bernie Hafif
Page 2

inventory as of December 31, 2006. Concept One's inventory report for the relevant time period did not show existing inventory of the following products: C07005, CO7007, CO7011. Yet, Concept One's royalty reports for April show sales of those products. Therefore, the sale of these products, as well as any other products that were not included in the inventory report Concept One provided to Procermex pursuant to the terms of the sell-off, was not authorized.

Accordingly, we are writing to advise you that, unless you take the following steps, our client shall take such action as necessary to stop your company's unlawful activities, including initiating a lawsuit in Federal Court for breach of contract, trademark infringement and unfair competition:

(1)    immediately stop distributing and selling all unauthorized products;

(2)    immediately stop selling all products that contain a design that was not approved by Marcas Modelo pursuant to your company's License Agreement;

(3)    immediately stop selling products that were subject to sell-off under the Procermex license;

(4)    immediately recall from all retail outlets all unauthorized products and all products that contain an unapproved design;

(5)    provide us with a detailed list of each type of unauthorized good or good bearing an unauthorized design sold, along with the total quantity sold and unit price for each good;

(6)    provide us with a report of each unauthorized good or good bearing an unapproved design currently in inventory, along with the quantity of each good and the location of the inventory, including goods en route to the United States and goods currently on order or in the process of manufacture; and

(7)    immediately pay all outstanding royalties due to Marcas Modelo.

If a lawsuit is necessary, our client will seek all relief available under Federal and New York State law, including a preliminary and permanent injunction, trebled damages, an accounting of profits, punitive damages, attorney fees and court costs. In addition, in view of your company's repeated breach of its License Agreement and blatant infringement of our client's trademark rights, the License Agreement between your company and Marcas Modelo is hereby terminated.

# K&L|GATES

Mr. Bernie Hafif
Page 3

We expect Concept One to fully comply with the termination provisions of the License Agreement, particularly Section 10.2, which provides that upon termination of the License Agreement, all rights granted to your company shall revert to Marcas Modelo and your company shall make no claim to such rights.

We also call your attention to Section 11 of the Agreement, which sets forth your company's duties upon termination. A copy of Section 11 of the License Agreement is attached to this letter for your reference. We caution you to carefully review Section 11 and to fully comply with its requirements, including that your company immediately cease manufacture of any product bearing the SUBJECT MARKS and immediately cease any other use of the SUBJECT MARKS.

Please understand that your failure to comply to the letter with every provision of Section 11 will subject your company to legal action. In this regard, we remind you that if such legal action is brought and Marcas Modelo prevails against your company, Marcas Modelo is entitled under Section 12.2 of the License Agreement to recover its costs and attorney's fees for bringing the legal action.

**These matters set forth herein are considered by our client to be serious and we expect your immediate attention and response by August 3, 2007.**

Marcas Modelo expressly reserves all of its rights and remedies in connection with this matter.

Very truly yours,

Darren W. Saunders

9.   Term and Termination

     9.1   Unless sooner terminated as provided in this Section 9, the term of this Agreement shall be from the Effective Date through **December 31st, 2007.**

     9.2   After one year from the effective date of this Agreement set forth below, the Agreement may be terminated at any time by either Party without cause on sixty days, advance written notice to the other Party.

     9.3   Should LICENSEE fail to comply with any provision of this Agreement, LICENSOR may terminate this Agreement on thirty days' advance written notice to LICENSEE; provided, that such termination shall be void if LICENSEE corrects such failure to the satisfaction of LICENSOR during the thirty day notice period.

10.   Effects of Termination

     10.1   Termination of this Agreement shall not impair any accrued rights of LICENSOR.

     10.2   Upon termination of this Agreement, all rights granted to LICENSEE under this Agreement shall revert to LICENSOR, and LICENSEE shall make no claim to such rights.

11.   LICENSEE'S Duties upon Termination.

     11.1   Upon the termination of this Agreement, LICENSEE shall immediately discontinue (a) the manufacture of any product bearing the SUBJECT MARKS, and (b) any other use of the SUBJECT MARKS; provided, that, subject to full compliance with the terms of this paragraph, for a period of three months after such termination LICENSEE shall have the right to dispose of its then existing stock of LICENSED PRODUCTS bearing the SUBJECT MARKS in the ordinary course of business at LICENSEE'S normal NET SALES PRICE. Such disposition shall be subject to the terms of this Agreement including, but not limited to, those requiring the reporting of sales and payment of royalties. ·LICENSEE shall be subject to the terms of this Agreement including, but not limited to, those requiring the reporting of sales and payment of royalties. Within thirty (30) days after the termination of such period, LICENSEE shall destroy all unsold LICENSED PRODUCTS bearing the SUBJECT MARKS and shall certify in writing to LICENSOR the number of each destroyed. Notwithstanding the foregoing provision, LICENSEE's rights to dispose of its stock after termination of this Agreement is subject to the condition that within fifteen days after such termination (a) shall pay to LICENSOR all royalties accrued to the time of termination, (b) shall deliver to LICENSOR a report of sales up to the time of termination in the form required by Section 5.1 of this Agreement, (c) shall provide LICENSOR with a written report of LICENSEE's remaining inventory of each of the unsold LICENSED PRODUCTS bearing SUBJECT MARKS, and (d) shall allow LICENSOR to conduct a physical inventory to verify such report.