# LICENSE AGREEMENT

Marcas Modelo, S.A. de C.V. a Mexican *Sociedad Anonima de Capital Variable* corporation (hereinafter "LICENSOR"), and Concept One Accessories a New York Corporation(hereinafter "LICENSEE"), agree as follows:

1. Definitions

    1.1    "SUBJECT MARKS" means the trademarks and related designs shown in Exhibit A and any other marks or designs incorporating any of those trademarks.

    1.2    "LICENSED PRODUCTS" means any product or part thereof listed in Exhibit B.

    1.3    "TERRITORY" means the United States of America and its possessions, but not including Puerto Rico or the Virgin Islands.

    1.4    "NET SALES PRICE" means LICENSEE's gross sales price for LICENSED PRODUCTS less actual quantity discounts and returns. No deduction shall be made for cash payments, uncollectible accounts or other discounts. Viable proof of uncollectible accounts or other discounts shall be provided to LICENSOR. No costs incurred in the manufacture, sale, distribution or promotion of the LICENSED PRODUCTS shall be deducted in computing NET SALES PRICE.

    1.5    "PARTY" means either, and "PARTIES" means both, of LICENSOR and LICENSEE.

2. Grant of License

    2.1    Subject to the terms of this Agreement, LICENSOR hereby grants LICENSEE a limited, revocable, non-exclusive authorization and license to use the SUBJECT MARKS in the manufacture, sale and distribution of the LICENSED PRODUCTS in the TERRITORY, but only in such form and manner as approved in advance by LICENSOR under Section 3 of this Agreement.

    2.2    No License is granted hereunder for the use of the SUBJECT MARKS for any purpose other than upon or in connection with the LICENSED PRODUCTS. No license is granted to LICENSEE hereunder for the manufacture, sale or distribution of LICENSED PRODUCTS to be used as a premium. "Premium" means any product given free or sold at less than its customary selling price for the purpose of increasing the sale, promotion, or publicizing of any other product or any service, including incentives for sales force, trade or consumers. LICENSEE shall not use any of the SUBJECT MARKS in connection with any sweepstakes,

1

lottery, game of chance or any similar promotional or sales device, scheme, or program. In the event LICENSEE desires to sell LICENSED PRODUCTS for such purposes, LICENSEE agrees to obtain, in advance, express written approval to do so from LICENSOR.

3. Quality Standards and Approval

    3.1 LICENSEE agrees that the LICENSED PRODUCTS shall conform to such standards and specifications as may be designated from time to time by LICENSOR. LICENSOR may change such standards and specifications upon notice to LICENSEE. The standards and specifications designated by LICENSOR, and any additions or amendments thereto, shall become effective thirty days after written notice of such standards and specifications to LICENSEE, and all LICENSED PRODUCTS manufactured by or for LICENSEE after that date shall conform to such standards and specifications unless otherwise agreed in writing by LICENSOR.

    3.2 For each LICENSED PRODUCT bearing any of the SUBJECT MARKS proposed by LICENSEE under this Agreement, LICENSEE shall submit in advance, to LICENSOR for approval two samples of the LICENSED PRODUCT in the form proposed for sale and distribution by LICENSEE, as well as samples of all packaging, promotional and advertising materials. Each product submitted by LICENSEE for approval shall be accompanied by photographs or drawings in duplicate, approximately 8 X 10 inches in size, which clearly and accurately display all designs and text appearing on the LICENSED PRODUCT. If LICENSOR approves a proposed design of a LICENSED PRODUCT, LICENSOR will give notice of approval to LICENSEE by stamping the photographs or drawings of approved designs and returning one set of the proposed duplicate photographs or drawings to LICENSEE. Unless a proposed design is approved in this manner or is otherwise specifically approved in writing by LICENSOR, the design shall be deemed disapproved. No LICENSED PRODUCT bearing any of the SUBJECT MARKS shall be used, displayed, advertised, offered for sale, sold, or otherwise distributed by LICENSEE unless and until it has been approved by LICENSOR as provided herein. Approval or disapproval of any LICENSED PRODUCT or design shall be in the absolute discretion of LICENSOR.

    3.3 The approval of any LICENSED PRODUCT by LICENSOR under Section 3.2 shall not be deemed to constitute the approval of any deviation from the standards and specifications for LICENSED PRODUCTS established by LICENSOR unless the sample submitted by LICENSEE is accompanied by a written statement disclosing the nature of the deviation and the deviation is specifically approved in writing by LICENSOR in addition to the approval of the design of the LICENSED PRODUCT under Section 3.2. The failure of the LICENSEE to disclose in writing a deviation from LICENSOR's standards and specifications shall nullify any approval of that LICENSED PRODUCT by LICENSOR, which shall be deemed void from the outset and of no effect.

    3.4 LICENSOR from time to time may amend the procedure for submission and approval of new designs by giving written notice of such amendment to LICENSEE.

3.5  After approval by LICENSOR, LICENSEE shall not change the design or quality of any LICENSED PRODUCT, or the appearance or manner of use of a SUBJECT MARK, without the prior written approval of LICENSOR. In the event the LICENSEE creates a new trademark or design through a change in the appearance of a SUBJECT MARK, the new trademark or design shall be the exclusive property of the LICENSOR, and LICENSEE's usage thereof shall be subject to the same terms and conditions imposed on the usage of all other SUBJECT MARKS under the terms of this Agreement.

3.6  LICENSEE agrees that all LICENSED PRODUCTS sold or distributed by LICENSEE will be the same as, or substantially identical in quality and appearance to, the initial sample approved by LICENSOR. LICENSEE shall maintain reasonable manufacturing, servicing and quality standards to insure that the LICENSED PRODUCTS are consistent with such initial samples. During the term of this Agreement (including the period provided in Section 11 for disposition of inventory following termination of this Agreement), upon prior notice to LICENSEE given by LICENSOR, the duly authorized representatives of LICENSOR shall have the right to inspect the premises of LICENSEE and its operations and inventory during all hours of operations to insure that standards of quality and consistency with approved samples of LICENSED PRODUCTS are being maintained. At the request of LICENSOR from time to time, LICENSEE shall submit to LICENSOR representative current samples and photographs of the LICENSED PRODUCTS which LICENSEE is manufacturing, selling, or distributing.

4.  Royalty

4.1  LICENSEE agrees to pay LICENSOR **Eight (8) percent (%)** of the NET SALES PRICE for each LICENSED PRODUCT bearing any of the SUBJECT MARKS sold or otherwise distributed directly by LICENSEE to retailers during the term of this Agreement. If LICENSEE sells or distributes LICENSED PRODUCTS bearing any of the SUBJECT MARKS to beer wholesalers, LICENSEE shall not be required to pay a royalty to LICENSOR. If LICENSEE sells or distributes LICENSED PRODUCTS bearing any of the SUBJECT MARKS to wholesalers, or other intermediate distributors of products, other than beer, who then resell the LICENSED PRODUCT at the retail level, LICENSEE shall pay to LICENSOR a royalty of **Sixteen percent (16%)** of the NET SALES PRICE on such sales. If LICENSEE at any time pays any other licensor a higher royalty rate or licensing rate than that provided in this Agreement for use in the TERRITORY of any name, mark, slogan or likeness on the same or similar product, LICENSEE shall immediately notify LICENSOR of such rate, and that higher rate shall automatically and immediately apply to this Agreement.

4.2  LICENSEE agrees that it will use its best efforts in connection with sales of the LICENSED PRODUCTS hereunder.

4.3  Royalties on sales made during each calendar month shall be paid within fifteen days following the end of that month, i.e., by the fifteenth day of the following month.

4.4  The initial term of this Agreement shall be a period commencing on **January 1st,2007 (the "Effective Date") and renewable on a calendar year basis thereafter.**

3

**LICENSEE shall pay LICENSOR an Advance Minimum Royalty of $ 20,000 ( Twenty Thousand Dollars USD).** Monthly royalties received by LICENSOR under Section 4.1 of this Agreement shall be credited against the Annual Minimum Royalty for the year in which such monthly royalties are earned. Any balance due on the Annual Minimum Royalty shall be paid within thirty days following the end of each calendar year. To the extent that the term of this Agreement includes one or more partial calendar years, the Annual Minimum Royalty for such calendar year shall be prorated on a daily basis. Any balance due on the Annual Minimum Royalty upon termination of this Agreement shall be paid within thirty days following the termination of the Agreement.

4.5    If any royalty payment described in Sections 4.1 through 4.4 of this Agreement is not made within the specified time limit, same shall bear interest until paid at the rate of the lower of (a) fifteen percent (%) per year or (b) the maximum legal rate applicable.

4.6    If it becomes necessary for LICENSOR to undertake legal action to collect any sum due under this Agreement, LICENSEE shall pay all reasonable legal fees and costs incurred by LICENSOR in connection therewith provided such legal action results in a determination that such sum was due LICENSOR.

5.    Accounts and Reporting

5.1    Each royalty payment made by LICENSEE under Section 4 of this Agreement shall be accompanied by a *written sales report* certified to be accurate by a financial officer of LICENSEE showing the total royalties due to LICENSOR. In addition, the report shall contain an itemized breakdown showing separately each type of LICENSED PRODUCT sold or distributed by LICENSEE: (i) the number sold or distributed at each royalty rate; (ii) the gross sales price(s) at each royalty rate; (iii) any deductions from the gross sales price(s) claimed by LICENSEE; (iv) the NET SALES PRICE at each royalty rate; and (v) the royalties due LICENSOR under this Agreement. The sales report shall be in the format specified by LICENSOR.

5.2    LICENSEE shall keep accurate accounts showing the manufacture and sale or other distribution of LICENSED PRODUCTS by LICENSEE. Such accounts shall be maintained for at least three years after the payment of the corresponding royalty and shall be available for inspection by duly authorized representatives of LICENSOR during normal business hours.

5.3    LICENSOR shall have the right to apply all generally accepted auditing standards and procedures to verify the accuracy of LICENSEE's records with respect to the manufacture, sale and distribution of LICENSED PRODUCTS covered by this Agreement. Such audit will be conducted at the sole expense of LICENSOR.

6. **Use of SUBJECT MARKS**

    6.1    LICENSEE shall not state or imply, directly or indirectly, that LICENSEE or LICENSEE's activities are supported, endorsed or sponsored by LICENSOR. LICENSEE shall not use the name of LICENSOR, including, without limitation, its corporate or trade name, in the business or affairs of LICENSEE except as designated by LICENSOR pursuant to Section 6.4 of this Agreement. LICENSEE shall not use any of the SUBJECT MARKS in the business or affairs of LICENSEE except as expressly authorized in this Agreement and approved in advance in writing by LICENSOR as to the form and manner of use pursuant to Section 3 of this Agreement.

    6.2    LICENSEE shall not alter, modify, dilute or otherwise misuse the SUBJECT MARKS or bring them into disrepute, and LICENSEE shall not add any words, denominations, or other graphic elements or symbols to the SUBJECT MARKS unless approved in advance in writing by LICENSOR pursuant to Section 3 of this Agreement.

    6.3    LICENSEE shall not use any trademark, service mark, trade name, logo, symbol or device other than the SUBJECT MARKS in connection with any of the LICENSED PRODUCTS without the prior written consent of LICENSOR; provided however, that LICENSEE shall affix a tag, label, imprint, or other devise to each LICENSED PRODUCT in such form, manner, location and size as approved in advance in writing by LICENSOR identifying LICENSEE as the manufacturer and distributor of such product.

    6.4    LICENSEE shall affix a tag, label, imprint or other appropriate device to each LICENSED PRODUCT in such form, manner, location and size as directed by LICENSOR bearing such copyright, trademark, service mark, or other propriety notices as LICENSOR may from time to time designate.

    6.5    At the request of LICENSOR, LICENSEE shall remove from any advertisement, marketing material, product or product package bearing the SUBJECT MARKS any element which LICENSOR, in the exercise of LICENSOR'S sole discretion believe will in any way harm the SUBJECT MARKS or the reputation of LICENSOR.

    6.6    LICENSEE recognizes the great value of the goodwill associated with the SUBJECT MARKS, and LICENSEE acknowledges that such goodwill is owned exclusively by LICENSOR and that any and all use of the SUBJECT MARKS by LICENSEE inures solely to the benefit of LICENSOR. LICENSEE acknowledges the validity of the SUBJECT MARKS and of this License Agreement, as well as LICENSOR's exclusive right, title and interest in and to the SUBJECT MARKS as applied to the LICENSED PRODUCTS under all applicable trademark, copyright, intellectual property and unfair competition laws. LICENSEE shall not in any manner represent or claim that LICENSEE has any ownership interest in the SUBJECT MARKS or in any registration thereof, and shall not knowingly in any way do or cause to be done, or assist others in doing or causing to be done, any act or thing contesting or in any way impairing LICENSOR's right, title and interest in and to the SUBJECT MARKS or the validity of this License Agreement. LICENSEE acknowledges that, except for the right licensed by this

Agreement, LICENSEE has no interest in any of the SUBJECT MARKS, and further agrees not to register or attempt to register in any territory any of the SUBJECT MARKS for any products or services, and not to use the SUBJECT MARKS for any products or service in any territory except as expressly licensed under this Agreement.

6.7    LICENSEE acknowledges that it shall not market, sell or distribute directly or indirectly the LICENSED PRODUCTS to toy stores or stores whose merchandise appeals primarily to persons below the legal purchase age for alcohol beverages.

6.8    LICENSEE acknowledges that it shall not market, sell or distribute the LICENSED PRODUCTS through licensee's website, unless written and prior approval has been granted by LICENSOR.

7.    Indemnification

7.1    LICENSOR assumes no liability to LICENSEE or to third parties with respect to the quality or use of the LICENSED PRODUCTS manufactured, sold or otherwise distributed by LICENSEE. LICENSEE agrees to indemnify and hold harmless LICENSOR, its officers, employees and agents from any and all claims, demands, actions, causes of actions, suits, proceedings, damages, liabilities and costs and expenses of every nature, including attorney's fees, relating to or arising out of the manufacture, sale or distribution of the LICENSED PRODUCTS pursuant to this Agreement or from the use of the LICENSED PRODUCTS so manufactured, sold or distributed.

7.2    LICENSOR makes no representations or warranties concerning the use of the SUBJECT MARKS in connection with the LICENSED PRODUCTS, and LICENSOR assumes no liability with respect to LICENSEE's use of the SUBJECT MARKS.

8.    Insurance

8.1    During the term of this Agreement, LICENSEE shall maintain in effect insurance for bodily injury and property damage including product liability, in per occurrence limits of not less than **$1,000,000.00.** Such insurance shall cover claims for damages of any kind arising out of the manufacture, sale, distribution, or use of the LICENSED PRODUCTS, regardless of when such claims are made or when the underlying injuries occur or manifest themselves. Each policy of such insurance shall name LICENSOR as an additional insured, shall provide for waiver of subrogation against LICENSOR and shall provide that notice shall be given to LICENSOR at least thirty days prior to cancellation or material change in the form of such policy. LICENSEE shall deliver certificates evidencing such insurance to LICENSOR within fifteen days after signing this Agreement, and LICENSEE shall not sell or otherwise distribute any LICENSED PRODUCTS until such insurance coverage is in effect.

9. <u>Term and Termination</u>

9.1    Unless sooner terminated as provided in this Section 9, the term of this Agreement shall be from the Effective Date through **December 31st, 2007**.

9.2    After one year from the effective date of this Agreement set forth below, the Agreement may be terminated at any time by either Party without cause on sixty days' advance written notice to the other Party.

9.3    Should LICENSEE fail to comply with any provision of this Agreement, LICENSOR may terminate this Agreement on thirty days' advance written notice to LICENSEE; provided, that such termination shall be void if LICENSEE corrects such failure to the satisfaction of LICENSOR during the thirty day notice period.

10.   <u>Effects of Termination</u>

10.1   Termination of this Agreement shall not impair any accrued rights of LICENSOR.

10.2   Upon termination of this Agreement, all rights granted to LICENSEE under this Agreement shall revert to LICENSOR, and LICENSEE shall make no claim to such rights.

11.   <u>LICENSEE'S Duties upon Termination.</u>

11.1   Upon the termination of this Agreement, LICENSEE shall immediately discontinue (a) the manufacture of any product bearing the SUBJECT MARKS, and (b) any other use of the SUBJECT MARKS; provided, that, subject to full compliance with the terms of this paragraph, for a period of three months after such termination LICENSEE shall have the right to dispose of its then existing stock of LICENSED PRODUCTS bearing the SUBJECT MARKS in the ordinary course of business at LICENSEE'S normal NET SALES PRICE. Such disposition shall be subject to the terms of this Agreement including, but not limited to, those requiring the reporting of sales and payment of royalties. LICENSEE shall be subject to the terms of this Agreement including, but not limited to, those requiring the reporting of sales and payment of royalties. Within thirty (30) days after the termination of such period, LICENSEE shall destroy all unsold LICENSED PRODUCTS bearing the SUBJECT MARKS and shall certify in writing to LICENSOR the number of each destroyed. Notwithstanding the foregoing provision, LICENSEE's rights to dispose of its stock after termination of this Agreement is subject to the condition that within fifteen days after such termination (a) shall pay to LICENSOR all royalties accrued to the time of termination, (b) shall deliver to LICENSOR a report of sales up to the time of termination in the form required by Section 5.1 of this Agreement, (c) shall provide LICENSOR with a written report of LICENSEE's remaining inventory of each of the unsold LICENSED PRODUCTS bearing SUBJECT MARKS, and (d) shall allow LICENSOR to conduct a physical inventory to verify such report.

7

12. <u>Remedies</u>

    12.1  LICENSEE acknowledges that its breach of this Agreement will result in immediate and irreparable damage to LICENSOR, for which money damages alone would be inadequate to compensate LICENSOR. Therefore, in the event of a breach or threatened breach of any provision of this Agreement by LICENSEE, LICENSOR may, in addition to all other remedies, immediately obtain and enforce injunctive relief prohibiting such breach or compelling specific performance of such provision.

    12.2  In the event that LICENSOR prevails, in whole or in part, in any action by or against LICENSEE or anyone in privity with LICENSEE arising out of or relating to this Agreement, LICENSOR shall be entitled to recover its costs and its reasonable attorney's fees.

13. <u>Confidentiality</u>

    13.1  All information contained in this Agreement and any and all information acquired by LICENSEE as a result of the license granted herein is and shall remain confidential. LICENSEE shall not disclose any of the aforementioned information, directly or indirectly, not use it in any way, either during the term of this Agreement or at any time thereafter, except as permitted under the terms of this Agreement. LICENSEE acknowledges that the terms of Section 12.2 are fully applicable to this paragraph.

14. <u>Severability</u>

    14.1  In the event any provision of this Agreement is determined to be unenforceable under or in conflict with the law of any applicable jurisdiction, such provision shall be deemed omitted from this Agreement, but the validity and enforceability of the remaining provisions shall not be affected by such deemed omission.

15. <u>Modification and Waiver</u>

    15.1  This Agreement may be amended only in writing signed by both Parties.

    15.2  No waiver by either Party of the breach of any provision of this Agreement shall be deemed a waiver of any continuing or subsequent breach of that provision or of any other provision.

16. <u>Assignability</u>

    16.1  This Agreement shall inure to the benefit of LICENSOR, its successors and assigns, and may not be assigned by LICENSEE without the prior written consent of LICENSOR. LICENSOR shall have no obligation to grant such consent.

    16.2  LICENSEE has no right to sublicense any of the rights granted under this Agreement.

17. <u>Governing Law</u>

17.1 This Agreement shall be governed by the laws of the State of New York, U.S.A. Each party hereby agrees to the jurisdiction and venue of the courts of the State of New York, for the litigation or resolution of any dispute between the parties pertaining to this Agreement.

18. <u>Notices and Payments</u>

18.1 Any notice, payment or other communication required by this Agreement, shall be deemed to have been properly given on the date of delivery if made in writing in the English language, and actually delivered (whether by first class mail, facsimile with confirmation, overnight courier, personal delivery or otherwise) to the corresponding address given below, or such other address as may be designated from time to time by either party by notice so given:

TO LICENSOR:

General Counsel Office
Av. Javier Barros Sierra No. 555-6 Piso
Col. Zedec Santa Fe
México, D.F. CP 01210


TO LICENSEE:
Mr. Bernie Hafif
Concept One Accessories
362 Fifth Avenue 2nd Floor
New York, NY 10001


19. <u>No Joint Venture</u>

19.1 This Agreement shall not constitute (a) a partnership or joint venture between LICENSOR and LICENSEE, (b) a franchise agreement between LICENSOR and LICENSEE, or (c) any legal relationship other than Licensor/Licensee. LICENSEE shall have no right to obligate or bind LICENSOR in any manner whatsoever, and nothing contained in this agreement shall give LICENSEE any right of agency or representation of LICENSOR vis-a-vis third persons.

20. <u>Entire Agreement</u>

20.1 This Agreement contains the entire agreement between the Parties with regard to the subject matter hereof and supersedes all other statements, representations and agreements pertaining to such subject matter.

IN WITNESS WHEREOF, the Parties have signed this Agreement to be effective as of **January 1st, 2007.**

**MARCAS MODELO, S.A. DE C.V.**

By: _____
Juan Fernandez

Concept One Accessories

By: _____
Mr. Bernie Hafif CFO

# EXHIBIT A

CORONA
CORONA AND DESIGN



CORONA EXTRA
CORONA EXTRA AND DESIGN



CORONITA EXTRA
CORONITA EXTRA AND DESIGN



CORONA LIGHT
CORONA LIGHT AND DESIGN



MODELO
MODELO AND DESIGN



MODELO ESPECIAL
MODELO ESPECIAL AND DESIGN

Modelo
especial

NEGRA MODELO
NEGRA MODELO AND DESIGN



PACIFICO
PACIFICO AND DESIGN



11

**EXHIBIT B**
**Hats, Headware, Beanies, Umbrellas** /*handwritten*/
*****************************************************************
/Flip Flops, T-shirts/