UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                 :

CERVECERIA MODELO, S.A. DE C.V. and    :   Civil Action No. 07 CIV 7998 (HB)
MARCAS MODELO, S.A. DE C.V.,    :

                Plaintiffs,    :

    -against-    :

USPA ACCESSORIES LLC d/b/a CONCEPT ONE  :
ACCESSORIES,    :

              Defendants.    :
-------------------------------------------------------------X

## PLAINTIFFS' PRETRIAL MEMORANDUM

Darren W. Saunders (DS 0456)
Joanna A. Diakos (JD 7269)
K&L GATES LLP
599 Lexington Avenue
New York, NY  10022
Tel:  (212) 536-3900
Fax:  (212) 536-3901

*Attorneys for Plaintiffs Cerveceria Modelo,
S.A. de C.V. and Marcas Modelo, S.A. de
C.V.*

# Table of Contents

**Page**

I.   FACTS ........................................................................................................... 1

    A.   The Parties ............................................................................................. 1

    B.   Corona Beer and The Corona Trademarks ........................................... 2

    C.   The Former Corona Licensing Program ............................................... 2

    D.   The 2007 Corona Licensing Program ................................................... 4

    E.   The License Agreement Between Marcas Modelo and Concept One .... 6

    F.   Concept One's Refusal to Abide By The Terms Of The 2007 License
       Agreement .............................................................................................. 7

    G.   Concept One's Submission of a Falsified Sales/Royalty Report .......... 9

    H.   Concept One's Total Disregard of Modelo's Efforts to Control the Use,
       Quality and Image of the Corona  Trademarks on Licensed Products ... 10

    I.   Concept One's Continued Sales of Corona-Branded Goods After Termination
      of its License Agreement ........................................................................ 10

    J.   Concept One's Repeated Failure to Produce Accurate and Complete Sales
      Information in the Litigation ................................................................... 11

    K.   Concept One's Position .......................................................................... 12

II.  LAW ............................................................................................................ 12

    A.   PLAINTIFFS' AFFIRMATIVE CLAIMS ........................................... 12

        1.   Concept One Infringed Plaintiffs' Registered CORONA Trademarks ...... 12

        2.   Concept One Breached The License Agreement ....................................... 17

    B.   DEFENDANT'S COUNTERCLAIMS ................................................. 19

        1.   Marcas Modelo Did Not Breach The Implied Covenant Of Good
           Faith And Fair Dealing ........................................................................... 19

        2.   Tortious Interference With Contract ........................................................ 20

           a.   Walmart did not Breach its Contract with Concept One ............... 21

    b. Plaintiffs' Alleged Interference Was Justified ...............................22

 C. PLAINTIFFS' DAMAGES ...........................................................................23

  1. Damages for Trademark Infringement and Unfair Competition ...............23

   a. Accounting of Profits.................................................................23

   b. Enhanced Damages....................................................................25

   c. Punitive Damages .....................................................................25

   d. Attorneys' Fees.........................................................................26

   e. Injunctive Relief.......................................................................27

 D. Damages for Breach of Contract and Attorney's Fees............................................27

CONCLUSION.............................................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 746 N.Y.S.2d 131 (2002) ............................................................................................................................19

*Baskin-Robbins Ice Cream Co. v. D&L Ice Cream Co.*, No. 83 Civ. 3697, 1983 U.S. Dist. LEXIS 11057 (E.D.N.Y. Dec. 7, 1983) ..................................................15, 16

*Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F. Supp. 947 (S.D.N.Y. 1980) ....................................................................................................24, 26

*Burger King Corp. v. C.R. Weaver*, 169 F.3d 1310 (11th Cir. 1999) ....................................16, 24

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217 (S.D.N.Y. 2004) ...........23

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38 (2d Cir. 1986) ..........................................................................................................14

*Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 639 N.Y.S.2d 977 (1995) .....................20

*Deering, Milliken & Co., Inc. v. Gilbert*, 269 F.2d 191 (2d Cir. 1959) ........................................24

*Dynamic Microprocessor Assocs., Inc. v. EKD Computer Sales & Supplies Corp.*, 1997 WL 231496 (E.D.N.Y. Apr. 14, 1997) ..............................................................13

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477 (S.D.N.Y. 1997) ...................22

*Franchised Stores of New York v. Winter*, 394 F.2d 664 (2d Cir. 1968) ......................................15

*Fursmidt v. Hotel Abbey Holding Corp.*, 200 N.Y.S.2d 256, 10 A.D.2d 447 (1st Dep't 1960) ..........................................................................................................................20

*George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992) ...........................23, 25

*Getty Petroleum Corp. v. Bartco Petroleup Corp.*, 858 F.2d 103 (2d Cir. 1988) ........................26

*Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431 (7th Cir. 1989)....15, 24, 26

*Gucci America, Inc. v. Dart, Inc.*, 715 F. Supp. 566 (S.D.N.Y. 1989) ..................................23, 25

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1988) ...................................................14

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) ...................................................20, 21

*Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413 (1996) ............................................20, 21

*Lon Tai Shing, Co. v. Koch + Lowy*, 1992 U.S. Dist. LEXIS 20783 (S.D.N.Y. 1992) ................26

*Mickle v. Christies, Inc.*, 207 F. Supp. 2d 237 (S.D.N.Y. 2002) ....................................................19

*Miller v. Almquist*, 241 A.D.2d 181, 671 N.Y.S.2d 746 (1st Dep't 1998) ....................................20

*Murjani Int'l Ltd. v. Sun Apparel, Inc.*, No. 87 Civ. 4628, 1987 U.S. Dist. LEXIS 6942 (1st Dep't 1998) ...........................................................................................................15, 16

*Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736 (2d Cir. 1998)................23

*Orange County Choppers, Inc. v. Olaes Enter., Inc. d/b/a ODM*, 497 F. Supp. 2d 541 (S.D.N.Y. 2007) ...........................................................................................................22

*P. Kaufmann, Inc. v. Americraft Fabrics, Inc.*, 232 F. Supp. 2d 220 (1st Dep't 2002) ................22

*Polo Fashions, Inc. v. Extra Special Products, Inc.*, 1980 U.S. Dist. LEXIS 16290 (S.D.N.Y. Mar. 5, 1980) .............................................................................................24, 26

*Professional Golfers Ass'n v. Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir. 1975)..........15

*Prozeralik v. Capital Cities Communications, Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 225 (1993) ...........................................................................................................................25

*Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369 (S.D.N.Y. 2000).............................................15

*San Francisco Arts & Ath. v. United States Olympic Committee*, 483 U.S. 522 (1987) ..............25

*Southland Corp. v. Froelich*, 41 F. Supp. 2d 227 (E.D.N.Y. 1999) .............................................15

*Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704 (2d Cir. 1982) ...........................................................................................................................13

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219 (10th Cir. 2000) ...........16, 26

*Vigoda v. DCA Prods. Plus Inc.*, 293 A.D.2d 265 (1st Dep't 2002).............................................22

## STATUTES

15 U.S.C. § 1057.................................................................................................................................14

15 U.S.C. § 1114.................................................................................................................................13

15 U.S.C. § 1117.................................................................................................23

15 U.S.C. § 1125.................................................................................................23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
CERVECERIA MODELO, S.A. DE C.V. and    :  Civil Action No. 07 CIV 7998 (HB)
MARCAS MODELO, S.A. DE C.V.,        :
:
             Plaintiffs,       :
:
  -against-               :
:
USPA ACCESSORIES LLC d/b/a CONCEPT ONE  :
ACCESSORIES,               :
:
             Defendants.     :
-------------------------------------------------------------------X

## PLAINTIFFS' PRETRIAL MEMORANDUM

Plaintiffs Cerveceria Modelo, S.A. de C.V. ("Cerveceria Modelo") and Marcas Modelo,

S.A. de C.V. ("Marcas Modelo") hereby submit this pretrial memorandum to apprise the Court

of the facts that Plaintiffs will establish at trial and to brief the Court on the applicable law.

I.     **FACTS**

     A.    **The Parties**

Plaintiff Cerveceria Modelo, based in Mexico City, Mexico, is a brewer and seller of

various brands of beer, including Corona Extra and Corona Light (collectively, "Corona Beer").

Plaintiff Marcas Modelo is a Mexican corporation that has the exclusive right to license the

Corona trademarks in the United States to companies who sell non-beer products bearing the

licensed marks, such as clothing, beach gear, barware and other items (hereinafter "licensed

products").

Defendant USPA Accessories LLC d/b/a Concept One Accessories ("Concept One") is a

company that sells clothing, including hats, and t-shirts and other products that contain licensed

trademarks.

NY-629524 v1

### B.    Corona Beer and The Corona Trademarks

Cerveceria Modelo has used the trademark Corona for beer since 1943 in the United States.  For the past ten years, Corona Extra has been the leading imported beer sold in the United States and today it ranks fourth in sales of all beer brands in this country.  The great success of Corona Beer is a result of the outstanding quality and superior taste of the product and Cerveceria Modelo's and its beer distributor's extraordinary advertising and promotional efforts.

Cerveceria Modelo has long used a sophisticated and unique advertising program for Corona that has created what Madison Avenue refers to as a "life-style" brand.  Over the years, Cerveceria Modelo has spent hundreds of millions of dollars to advertise Corona beer on television, billboards, in print and other media.  These advertisements portray Corona as the brand of relaxation, with most of the advertising centered on beach themes.  (P-26.)[1]  Cerveceria Modelo's advertising efforts have generated vast goodwill and strong consumer recognition.

Cerveceria Modelo has taken great care to protect the enormous goodwill symbolized by the Corona trademarks, including the procurement of numerous U.S. Trademark Registrations from the U.S. Patent and Trademark Office.  (P-1 to P-15.)  The Corona trademarks are the most valuable assets owned by Cerveceria Modelo.

### C.    The Former Corona Licensing Program

The lifestyle image created by Cerveceria Modelo's advertising and promotional efforts has created a great demand in the marketplace for clothing and many other items that bear the Corona trademarks.  Indeed, of all of the major companies that license their trademarks in the United States – whether in the fields of alcoholic beverages, entertainment and motion pictures, sports, or others – Corona is among the top, if not number one, in sales of licensed brands in the

---

[1] References to "P-__" are to Plaintiffs' trial exhibits.

United States. Because of the unparalled demand for licensed products bearing the Corona trademarks, and in particular, hats, t-shirts and other articles of clothing, a license to produce and sell Corona-branded merchandise is a coveted privilege.

Cerveceria Modelo has for many years licensed the Corona trademarks to sellers of a wide variety of products. In general, these products are licensed either to companies who sell promotional products to beer distributors, or companies who sell consumer oriented products to retailers. Far more important than merely producing an additional revenue stream, the licensing of a famous brand such as Corona can be a significant augmentation to the brand advertising and promotional programs. Simply put, when people wear in public clothing that displays the trademark of a company's brand – this is advertising.

Prior to 2007, the licensing program for Corona was administered by a U.S. affiliate of Cerveceria Modelo's parent, Grupo Modelo, S.A.B. de C.V. This affiliate company, called Procermex, Inc., was based in San Antonio, Texas. Due to the popularity of Corona for licensed products, hundreds of companies have vied for licenses from Procermex. By 2006, there were 69 licensees selling licensed Corona-branded products. But with all of this commercial activity, in 2006 Cerveceria Modelo observed that the licensing program was actually hindering instead of augmenting Cerveceria Modelo's advertising and promotional efforts for Corona. In particular, there began to be a proliferation of products in the marketplace, the quality of which was not consistent with that of Corona beer and the Corona advertising campaign.

As Corona is the crown jewel of Cerveceria Modelo's brands, the company decided to take definitive action. Instead of trying to fix or revamp the existing Procermex licensing program, Cerveceria Modelo created an entirely new program. The goal was to gain more control over licensees and to have greater input into the ways in which the Corona trademark is

used on licensed products in the United States.  Thus, in 2006, dramatic changes were being put in place for 2007.  These included:

1.      the creation of a new Mexican corporation to license the Modelo trademarks -- Plaintiff Marcas Modelo;

2.      a substantial reduction in the number of licensees (from 69 to 18);

3.      a new license agreement with greater restrictions and controls than the Procermex agreements;

4.      new procedures and tools, including a web-based creative design submission and approval system; and

5.      a greater emphasis on partnering with licensees to create a mutually beneficial, long-term relationship and ensure quality products in the marketplace.

Thus, in mid-2006 Modelo executives met to determine which licensees would continue with the new program and which would not.  Modelo selected 18 licensees that Modelo believed were best suited to move forward with the new licensing program.  Most of these licensees were former Procermex licensees.

### D.      The 2007 Corona Licensing Program

In January of 2007, Marcas Modelo began the task of building the entirely new trademark licensing program.  It appointed Juan Fernandez to oversee the submission and approval process for proposed artwork and designs for licensed goods.

Mr. Fernandez began to create (with help from an outside firm) a web-based submission process to replace the paper submission procedure.  Mr. Fernandez also began to work on a Policy and Procedures Manual to assist licensees in understanding their rights and obligations under the new license agreement.  Plaintiffs also wanted to give guidance to licensees in creating and selecting artwork and designs that would portray the Corona brand in a manner consistent with its brand positioning and that would project the refined and quality image sought by

Plaintiffs for future licensed products. Thus, Mr. Fernandez and Marcas Modelo's counsel began working on a set of guidelines to be included in the Policy and Procedures Manual. In addition, Cerveceria Modelo and its affiliates would be involved in the design approval process – a level of review was added for a member of the International Marketing Department to review submissions after approval from Marcas Modelo to assess whether, from a marketing perspective, the new designs for licensed products were consistent with Corona's brand positioning and advertising campaigns.

Mr. Fernandez also met with each of the licensees in person in an effort to foster a positive business partnership. Marcas Modelo wanted its licensees to understand that design approvals would not be as freely granted as at Procermex and that there were going to be much tighter controls. The task of ramping up and implementing the new licensing program was daunting – there were obstacles and delays. In early 2007, Marcas Modelo was inundated with hundreds of design submissions from licensees. At the same time, Marcas Modelo was getting input from management at Cerveceria Modelo as to the type of designs and products that Cerveceria Modelo wanted for the new licensing program.

Mr. Fernandez asked the licensees to be patient and understanding, since it was not going to be business as usual, at least for the first half of 2007. In the meantime, to accommodate the licensees and enable them to continue selling Corona–branded merchandise, Plaintiffs extended the sell-off period of the 2006 Procermex license from three months to six months, so that licensees could continue to sell their inventory of Corona-branded products that were approved in 2006 through June 30, 2007.

E.    **The License Agreement Between Marcas Modelo and Concept One**

Concept One had been a licensee of the Corona trademarks with Procermex since 2004. (P-17.)  During those three years, Concept One had sales of over $8.5 million of Corona-branded merchandise.  Concept One was one of the 18 licensees selected to continue under the Marcas Modelo program beginning in 2007.  Marcas Modelo and Concept One entered into a license agreement effective as of January 1, 2007 (the "License Agreement").  (P-16.)  Among the many provisions regarding quality standards and approval, the License Agreement provides:

> No LICENSED PRODUCT bearing any of the SUBJECT MARKS shall be used, displayed, advertised, offered for sale, sold, or otherwise distributed by LICENSEE unless and until it has been approved by LICENSOR as provided herein.  *Approval or disapproval of any LICENSED PRODUCT or design shall be in the absolute discretion of LICENSOR.*

(P-16 at 2, emphasis added.)

In December 2006, Mr. Fernandez wrote to each of the licensees who had been selected for the Marcas Modelo program to welcome them and to explain that the licensing program was being changed to improve the image and increase the value of the brands in the marketplace.  (P-68.)  In addition, Mr. Fernandez referenced the new set of guidelines for licensees on which he was working.  In March 2007 each of the licensees, including Concept One, received a document entitled "Policies & Procedures Manual for Licensees in the United States and Canada."  (P-18.)  This document explained to licensees on page 1 that "This License Manual is designed to asset you in proper usage of the Modelo Marks and in selecting appropriate designs for Licensed Products."  (P-18 at 1.)  The licensees were also cautioned that their license to use the Corona trademarks comes with obligations:

> Along with the privilege of being authorized to sell officially licensed Marcas Modelo merchandise comes the responsibility of using the Modelo Marks properly and not engaging in activity that may damage, tarnish or mislead the consumer about the Modelo

Marks. Our Licensees are expected to use the Modelo Marks in ways that are consistent with the image and reputation of Modelo products, such as by using the Modelo Marks in an attractive and tasteful manner on high quality products.

(P-18 at 1.)

The License Manual also reminded licensees that the guidelines contained in the Manual are not definitive: *"Please note that the following are guidelines only, and are provided to assist you in selecting designs. . . .Marcas Modelo's decision with respect to rejection of a particular design is final, regardless of whether the design is covered by these guidelines."* (P-18 at 7, emphasis added.)

## F.    Concept One's Refusal to Abide By The Terms Of The 2007 License Agreement

Most of the Marcas Modelo licensees were understanding of the issues that Marcas Modelo was facing in early 2007 in starting the new licensing program, and in particular of the delays in receiving product design approvals. There were far more rejections of designs than at Procermex as a result of Marcas Modelo's stricter approval standards. The approval process was an evolving work-in-progress and Marcas Modelo expected that licensees would work with it and in time would come to understand what Marcas Modelo was looking for. One way to do this was to provide explanations as to why particular submissions were being rejected and why they were not consistent with the qualities and image that it wanted to portray for Corona-licensed products. (P-127.) In the meantime, these licensees were continuing to enjoy sales of numerous Corona-branded products under the sell-off provision of their 2006 Procermex license agreements.

Unlike most of the other Marcas Modelo licensees, Concept One was not understanding and was not patient. Indeed, in February 2007, Concept One's president, Mr. Sam Hafif, began demanding that Mr. Fernandez approve the hundreds of designs that his company was

submitting.  Mr. Fernandez explained that he could not do so, that Concept One must comply

with the terms of the License Agreement and that Concept One should be patient.  Also, as it was

doing with all of the 2007 licensees, Marcas Modelo made efforts to explain to Concept One on

the creative submission website the reasons for its rejection of many of Concept One's design

submissions.  (P-127.)

Mr. Fernandez assured Mr. Hafif that his patience would pay off.  But Mr. Hafif refused

and continued to demand that Marcas Modelo immediately approve Concept One's designs.

Finally, on March 1, 2007, Mr. Hafif threatened that if he did not receive immediate approvals,

he would simply sell the merchandise anyway.

Concept One did just that.  In fact, on March 23, 2007, Mr. Hafif sent an email to his

team which stated:

> *I will be approving Corona going forward.*
>
> *You still need to submit to Corona on the website, but as far as Webtech goes, you will apply my approval or disapproval and production will follow my approval.*
>
> *My approval overrides Corona's as far as Webtech goes.*

(P-69.)

Thereafter Concept One completely disregarded its obligations under the License

Agreement and sold whatever products it wanted to sell without the authorization or approval of

Marcas Modelo.  In addition, Concept One was angry that in 2007 it did not receive a license to

sell Corona-branded bags, as it had under the Procermex license agreement.  (P-16 Exhibit B, P-

17 Exhibit B.)  Concept One ignored this fact as well and proceeded to manufacture and sell

many thousands of units of bags in 2007 even though it knew that it had no right to do so.

During this period of time, the first three months of 2007, Concept One, while acting in total

disregard for the 2007 license, was also taking full advantage and reaping all of the benefits of

the sell-off of Corona goods under the 2006 license agreement.  Indeed, Concept One sold over $1.4 million worth of Corona-branded goods under the Procermex license in these three months alone.  (P-36.)

### G.     Concept One's Submission of a Falsified Sales/Royalty Report

In July 2007 Concept One submitted its June royalty report to Marcas Modelo.  (P-21.) Concept One falsified the contents of the report by including sales information for only four products.  These four products contained designs that were approved by Marcas Modelo in 2007. Concept One omitted any reference to the numerous other products that it had sold in June 2007, the designs for all of which had not been approved by Marcas Modelo.  (P-36.)  Thus, Concept One reported and paid royalties on sales of $1,118 for June 2007 while in fact its actual sales totaled at least $467,000.  (P-21, P-36.)

Any doubt that Concept One acted intentionally and maliciously is erased by its written confirmation that it falsified ("fudged") the June sales report.  (P-22.)  Adding insult to injury, Concept One joked about the matter in email correspondence.  Concept One's President Mr. Hafif sarcastically stated in an email to his Divisional Vice President and Concept One's Controller who prepared the royalty report that "*It's amazing that our sales in June were only of approved styles, that's really incredible.*"  (P-22.)  Concept One's Divisional Vice President replied "*A little fudging?*"  Mr. Hafif responded "*Fudge u*" to which the Divisional Vice President in turn responded "*I like fudge!*"  (P. 22.)

**H.    Concept One's Total Disregard of Modelo's Efforts to Control the Use, Quality and Image of the Corona Trademarks on Licensed Products**

Although Marcas Modelo was experiencing substantial difficulties with Concept One, it was working very hard to try to make the new licensing program a success. Marcas Modelo continued to fulfill its obligations under the License Agreement by reviewing Concept One's submissions, and approving appropriate designs. For example, on June 6, 2007, well after the dispute over approvals arose, Marcas Modelo approved a Concept One Corona Extra hat for sale. (P-80.) Mr. Fernandez also tried to improve Marcas Modelo's relationship with Concept One and to resolve outstanding issues.

In June 2007 Mr. Fernandez agreed to meet with Mr. Hafif at Concept One's office and showroom in New York. Discovery has revealed that Concept One was not acting in good faith at the time of Mr. Fernandez' visit and was belittling Marcas Modelo's efforts to improve the quality of licensed Corona goods in the marketplace and ignoring the 2007 guidelines. Mr. Hafif sent the following email to certain of his salespeople, which makes clear that Concept One was offering for sale and/or selling Corona-branded products that were in direct contravention of the Marcas Modelo licensee guidelines: *"Juan is in town. Please remove all military or green hats from the showroom and anything that you think could be questionable."* (P-78.)

**I.    Concept One's Continued Sales of Corona-Branded Goods After Termination of its License Agreement**

By letter of July 26, 2007, Marcas Modelo terminated Concept One's License Agreement. (P-39.) Undaunted, Concept One continued to sell substantial quantities of Corona-branded merchandise throughout the remainder of 2007. (P-36.) Moreover, Concept One did not report any of these sales to Marcas Modelo and did not pay royalties on any of these sales. It

appears that these unauthorized and unreported sales totaled approximately $4.3 million, although, as explained below, this figure may be much greater.

**J.      Concept One's Repeated Failure to Produce Accurate and Complete Sales Information in the Litigation**

In discovery, Plaintiffs sought the production of information and documents that would reveal Concept One's total sales of all Corona-branded products made in 2007.  In January 2008 Concept One produced a sales report which purported to contain all of Concept One's sales of Corona-branded products in 2007.  (P-63, Ex. B.)  Plaintiffs' expert, a forensic accountant, Mr. Ronald Vollmar, compared the sales report to certain inventory reports also produced by Concept One.  (P-121.)

Mr. Vollmar noticed a significant discrepancy between products shown as being in inventory as of January 8, 2007 versus July 26, 2007 and the information in the sales report.  The bottom line was that it appeared that Concept One had made additional sales in 2007 that were not reflected in the sales report produced by Concept One in discovery.  (P-121 at 4.)

Plaintiffs wrote to Concept One's counsel to point out the discrepancy and to request the immediate production of complete and accurate sales information.  Thereafter, on July 29, 2007, Concept One produced another sales report for 2007.  This report showed that Concept One had made over $700,000 in sales of Corona-branded products that were not included in the initial report.  (P-36, P-63, P-121.)

In preparing for trial, Mr. Vollmar conducted another analysis of an additional inventory report dated January 2008 and noticed yet another substantial inconsistency.  It appears that the second sales report is also inaccurate and incomplete.  There are still many thousands of units of Corona-branded goods that are no longer in Concept One's inventory report but the sales for which are not included in the second sales report produced by Concept One on July 29, 2008.

On August 7, 2008, plaintiffs again wrote to Concept One's counsel to apprise him of the additional inconsistencies and to again demand that Concept One produce complete and accurate sales information. Concept One has not responded to this letter.

### K.    Concept One's Position

Against the foregoing factual backdrop, Concept One has taken the position that Plaintiffs have breached the License Agreement and did not act in good faith. Defendant claims that Marcas Modelo did not issue enough approvals and did not issue approvals fast enough and that this constitutes a breach of the implied covenant of good faith and fair dealing. Concept One also claims that Marcas Modelo tortiously interfered with a potential sale to Walmart by sending a letter to Walmart to advise that Concept Once had been terminated as a Corona licensee and by advising third party licensees that Concept One's License Agreement was terminated. (P-100, P-101.)

## II.    LAW

### A.    PLAINTIFFS' AFFIRMATIVE CLAIMS

#### 1.    Concept One Infringed Plaintiffs' Registered Corona Trademarks

Plaintiffs will establish at trial that Concept One willfully infringed the Corona trademarks by: (1) intentionally manufacturing and selling Corona-branded goods, such as bags, wallets and wristbands, that it was not authorized to sell under the License Agreement; (2) intentionally manufacturing and selling Corona-branded goods bearing designs that were not approved by Marcas Modelo under the License Agreement, and, in many cases were specifically disapproved by Marcas Modelo; and (3) making the conscious decision to continue to sell Corona-branded goods after its License Agreement was terminated on July 26, 2007 and it was

informed that any continued sale of Corona-branded goods would constitute trademark infringement under federal and New York common law.[2]

Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(1) provides:

> (1) Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

In order to prevail on its claim of trademark infringement, Plaintiffs bear the burden of proving that: (1) Cerveceria Modelo owns valid trademarks; and (2) Concept One's use of the

---

[2] For the same reasons, Concept One has infringed Plaintiffs' CORONA trademarks under common law. "The 'heart of a successful claim based upon . . . the Lanham Act . . . and common law trademark infringement claim is the showing of likelihood of confusion as to the source or sponsorship of defendant's products.'" *Dynamic Microprocessor Assocs., Inc. v. EKD Computer Sales & Supplies Corp.*, 1997 WL 231496, at *19 (E.D.N.Y. Apr. 14, 1997) (quoting *Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir. 1982)). Most courts evaluate both types of trademark infringement claims together. *Dynamic Microprocessor*, 1997 WL 231496, at * 19. To the extent that there is any difference between the two claims, "the 'essence ... [of the common law claim] is that the defendant has misappropriated the labors and expenditures of another.' " *Id.* Central to this cause of action is the element of bad faith. *Dynamic Microprocessor*, 1997 WL 231496, at *19. As is set forth in more detail in the Fact section, above, the record is replete with evidence of Concept One's bad faith. Plaintiffs refer the Court to the discussion of its Lanham Act causes of action, and submit that the record shows Concept One's liability for common law trademark infringement, unfair competition and violations of Sections 349 and 360-l of New York General Business Law as a matter of law.

Corona trademarks creates a "likelihood of confusion" as to the source or sponsorship of the goods.

Here, there is no dispute that the Corona trademarks are valid. Indeed, Cerveceria Modelo's certificates of registration are *prima facie* evidence of the validity of the Corona trademarks, its ownership of them, and its exclusive right to use them in commerce or in connection with the goods or services specified in the certificates. 15 U.S.C. § 1057(b); *see, e.g., Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 42 (2d Cir. 1986) (noting that "[a]s holders of numerous federally registered trademarks" plaintiff is entitled to a strong presumption of [its] marks' validity and of ownership"). Moreover, in the License Agreement, Concept One has acknowledged the Corona trademarks' validity and Plaintiffs' exclusive ownership of them. (P-16, § 6.6.) Therefore, the only question for the jury to determine is whether Plaintiffs have demonstrated a likelihood of confusion as to the source or sponsorship of the Corona-branded products sold by Concept One.

The jury determines whether "an appreciable number of ordinarily prudent purchasers" are likely to be misled, or indeed simply confused, as to the source or sponsorship of the goods in question. *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 75 (2d Cir. 1988). In typical trademark infringement actions in which there is no license involved, the jury weighs a number of factors as set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*: (a) the strength of plaintiff's mark; (b) the degree of similarity between the two marks; (c) the competitive proximity of the products; (d) the likelihood that plaintiff will bridge the gap between the two markets; (e) the existence of actual confusion; (f) the defendant's good faith in adopting the mark; (g) the quality of the defendant's product; and (h) the sophistication of the purchasers. 287 F.2d 492, 495 (2d Cir. 1961).

However, in the case of an ex-licensee, such as here, the marks are identical and the issue is merely one of use without consent. As such, numerous courts have held that the "sale by a licensee of unauthorized products, i.e., products outside the scope of the license, is likely to confuse the public into believing that such products are in fact manufactured or authorized by the trademark owner" and, therefore, " such conduct constitutes trademark infringement." *Baskin-Robbins Ice Cream Co. v. D&L Ice Cream Co.,* No. 83 Civ. 3697, 1983 U.S. Dist. LEXIS 11057, at *12 (E.D.N.Y. Dec. 7, 1983) (citing *Franchised Stores of New York v. Winter,* 394 F.2d 664 (2d Cir. 1968); *Murjani Int'l Ltd. v. Sun Apparel, Inc.*, No. 87 Civ. 4628, 1987 U.S. Dist. LEXIS 6942 (S.D.N.Y. July 31, 1987) (similar). Accordingly, there is no need in this case to consider the *Polaroid* factors.

As a result of Concept One's acts of trademark infringement and additional breaches of the License Agreement, Plaintiffs validly terminated Concept One's License Agreement on July 26, 2007. (P-39.) Despite the termination, the evidence will show that Concept One continued to sell Corona-branded goods to retailers throughout the United States. The continued use by Concept One of the Corona trademarks after the License Agreement was terminated constitutes additional acts of trademark infringement as well as a breach of contract. *See, e.g., Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 436 (7th Cir. 1989) (franchisee who knowingly and deliberately continued to use trademark after franchise was terminated, guilty of trademark infringement); *Professional Golfers Ass'n v. Bankers Life & Casualty Co.,* 514 F.2d 665, 669-70 (5th Cir. 1975) (general rule is that, upon termination of license, "a licensee's right to the mark ends, and any subsequent use constitutes infringement"); *Ryan v. Volpone Stamp Co.,* 107 F. Supp. 2d 369, 399 (S.D.N.Y. 2000); *Southland Corp. v. Froelich,* 41 F. Supp. 2d 227, 243 (E.D.N.Y. 1999) (holding that where the alleged unauthorized user of the trademark

- 15 -

continues to use the identical, previously licensed trademark after revocation of the license, likelihood of confusion is established); *Murjani Int'l, Ltd. v. Sun Apparel, Inc.*, No. 87 Civ. 4628, 1987 U.S. Dist. LEXIS 6942 (S.D.N.Y. July, 31, 1987) ("common sense compels the conclusion that a strong risk of consumer confusion arises where a terminated [licensee] continues to use the former [licensor's] trademarks"); *Baskin-Robbins Ice Cream Co.*, 1983 U.S. Dist. LEXIS 11057, at *12 (continued use of licensed trademarks after franchise agreement was terminated constitutes trademark infringement and breach of contract).

Plaintiffs will also demonstrate at trial that Concept One's acts of infringement and unfair competition were willful.  The evidence introduced at trial will show that Concept One's President, Sam Hafif, declared to his staff in writing:  "I will be approving Corona going forward." (P-69.) Mr. Hafif took these actions with full knowledge that the License Agreement gave absolute discretion to Marcas Modelo to approve or disapprove designs.[3]  Compounding the matter, Concept One attempted to hide the fact that it was selling unauthorized and unapproved products by not disclosing the infringing goods it had sold on its June royalty report and by removing infringing goods in its showroom when Mr. Fernandez was in town to visit.  (P-21, P-78.) *See, e.g., United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1232 (10th Cir. 2000) (deliberate relabeling of inferior product under plaintiff's mark, even after repeated warnings to cease, was malicious, fraudulent, deliberate and willful"); *Burger King Corp. v. C.R. Weaver,* 169 F.3d 1310, 1321-22 (11th Cir. 1999) (use of mark after franchise terminated and notification given was willful and deliberate).

---

[3] It is fundamental in trademark and licensing law that as the owner and licensor of the Corona trademarks Plaintiffs – not Defendant – have the absolute and unfettered right to dictate and control how their trademarks are used by licensees. *See, e.g., El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark.").

2.    **Concept One Breached The License Agreement**

Marcas Modelo will demonstrate at trial that Concept One breached the unambiguous terms of the License Agreement by: (1) manufacturing and selling Corona-branded goods that were not authorized under the License Agreement, such as bags, wallets and wristbands; (2) manufacturing and selling Corona-branded goods bearing designs that were specifically disapproved by Marcas Modelo; (3) manufacturing and selling Corona-branded goods bearing designs that were not approved by Marcas Modelo; (4) failing to pay royalties on approved Corona-branded goods that were sold to retailers; and (5) continuing to sell Corona-branded goods after its License Agreement was terminated.

As set forth in the License Agreement, Concept One was granted a license to use the Corona trademarks in certain circumstances on "LICENSED PRODUCTS." Section 1.2 of the License Agreement defines LICENSED PRODUCTS as "any product or part thereof listed in Exhibit B." Hence, Exhibit B to the License Agreement sets forth the goods that Concept One was authorized to sell bearing the Corona trademarks in 2007: "Hats, Headware, Beanies, Umbrellas, Flip Flops, T-Shirts." (P-16, Ex. B.) Bags, wallets and wristbands are not included. Notwithstanding that it did not have a license to sell bags, wallets and wristbands bearing the Corona trademarks, the evidence will show that Concept One sold many of these products to retailers in the United States.

Concept One also agreed in the License Agreement that the Licensed Products would conform to the standards and specifications designated by Marcas Modelo. (P-16, § 3.1.) Concept One also agreed to submit, prior to the manufacture or sale of Licensed Products, two samples of each of the Licensed Products in the form proposed for sale and distribution, as well

as samples of all packaging, promotional and advertising materials, for approval by Marcas Modelo. (P-16, § 3.2.) Section 3.2 clearly stated that "No LICENSED PRODUCT bearing any of the SUBJECT MARKS shall be used, displayed, advertised, offered for sale, sold, or otherwise distributed by LICENSEE unless and until it has been approved by LICENSOR as provided herein." "Approval or disapproval of any LICENSED PRODUCT or design shall be in the absolute discretion of LICENSOR." (P-16, § 3.2.)

Despite the License Agreement's clear language, the evidence will show Concept One sold thousands of products bearing designs that were not only not approved by Marcas Modelo, but that were specifically disapproved by Marcas Modelo.

The License Agreement also provided that "each royalty payment made by LICENSEE under Section 4 of this Agreement shall be accompanied by a written sales report certified to be accurate by a financial officer of LICENSEE showing the total royalties due to LICENSOR." (P-16.) Concept One also violated this section of the License Agreement by submitting a royalty report in June that was materially inaccurate in that it omitted to account for more than $465,000 in sales. The evidence will show that Concept One falsified its June royalty report to only include sales of Corona-branded goods bearing designs that were approved by Marcas Modelo. The evidence will further show that Concept One falsified its June royalty report despite the fact that its attorney had advised it that it should report and pay royalties on all products sold. This too, constitutes a material breach of contract.

Concept One was required upon termination of the License Agreement to immediately discontinue the manufacture of any product bearing the Corona Trademarks and to cease all other use of the Corona Trademarks. (P-16, § 11.1.) The evidence at trial will show that Concept One also disregarded this section of the License Agreement. Not only did Concept One

continue to sell Corona-branded goods after its License Agreement was terminated, it did not pay

royalties to Marcas Modelo on any of these sales, including of approved licensed products.

Marcas Modelo will demonstrate at trial that it suffered damages as a result of Concept

One's multiple breaches of the License Agreement as described above.  These damages consist

of unpaid royalties on the sale of approved Corona-branded goods and the costs of bringing this

action, including attorney's fees.  Section 12.2 of the License Agreement provides:

> 12.2    In the event that LICENSOR prevails, in whole or in part,
> in any action by or against LICENSEE or anyone in privity with
> LICENSEE arising out of or relating to this Agreement,
> LICENSOR shall be entitled to recover its costs and its reasonable
> attorney's fees.

(P-16, § 12.2.)

### B.    DEFENDANT'S COUNTERCLAIMS

### 1.    Marcas Modelo Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing

Concept One will not be able to establish at trial that Marcas Modelo breached the

implied covenant of good faith and fair dealing by failing to approve designs submitted by

Concept One to Marcas Modelo.  As set forth in Section A above, Section 3.2 of the License

Agreement prohibited Concept One from selling any Corona-branded products bearing designs

that had not been approved by Marcas Modelo.  The License Agreement gave Marcas Modelo

"absolute discretion" to approve or disapprove of designs or licensed products.  (P-16, § 3.2.)

In interpreting clauses that afford one party "sole" or "absolute" discretion in an

agreement, courts have held that the implied covenant of good faith and fair dealing is not

violated so long as the party afforded the discretion uses its honest judgment in exercising the

discretion. *See, e.g., Mickle v. Christies, Inc.,* 207 F. Supp. 2d 237 (S.D.N.Y. 2002)

("Agreements conferring upon one party an indefinite right to condition performance upon a

determination that is based on an act of personal discernment or sole discretion are uniformly

upheld –subject to a duty on the part of the party so empowered to exercise honest judgment");

*511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 746 N.Y.S.2d 131 (2002);

*Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 639 N.Y.S.2d 977 (1995); *Miller v.*

*Almquist*, 241 A.D.2d 181, 671 N.Y.S.2d 746 (1st Dep't 1998) (noting that where the contract

"contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or

irrationally in exercising the discretion"); *Fursmidt v. Hotel Abbey Holding Corp.,* 200 N.Y.S.2d

256, 260, 10 A.D.2d 447, 451 (1st Dep't 1960) (finding that it was error for trial court to give the

jury the question of the reasonableness of the defendant's dissatisfaction and stating that it was

sufficient that the jury be satisfied that "it was dissatisfaction honestly arrived at").

Here, the individuals involved in reviewing designs submitted by licensees will explain at

trial how they exercised their judgment in approving or disapproving designs.  There is

absolutely no evidence that Marcas Modelo acted in bad faith, irrationally or unfairly in

disapproving Concept One's designs.  Indeed, Concept One was treated no differently than any

of the other licensees with regard to creative submission and approval.  Accordingly, Concept

One will not be able to demonstrate that Marcas Modelo breached the contract or the covenant of

good faith and fair dealing by disapproving the designs submitted by Concept One.

2.    **Tortious Interference With Contract**

To succeed at trial on its claim for tortious interference with contract, Concept One must

prove: (1) the existence of a valid contract between Concept One and a third party; (2) Plaintiffs'

knowledge of that contract; (3) Plaintiffs intentional and improper procurement of a breach of

that contract without justification; (4) actual breach of the contract; and (5) resulting damages.

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith*

*Barney, Inc.*, 88 N.Y.2d 413, 424 (1996)). Concept One will not be able to establish its tortious interference claim at trial for two principal reasons: (1) Walmart did not breach its agreement with Concept One by canceling its orders; and (2) Concept One cannot establish that Plaintiffs' alleged interference was "improper" and without justification.

### a.    Walmart did not Breach its Contract with Concept One

It is well settled that a party cannot establish a claim for tortious interference with contract absent proving a breach of contract by the third parties. *Lama Holding Co.*, 88 N.Y.2d at 424. Concept One will not be able to prove at trial that Walmart breached its contract with Concept One by canceling its pending orders. This is because the evidence will show that Walmart had the absolute right to cancel its orders given its knowledge that Concept One's License Agreement was terminated and Concept One thereafter did not have the right to fulfill existing orders. The omnibus agreement governing Walmart's relationship with Concept One, the supplier agreement, provided that Walmart could cancel its orders if Concept One failed to comply with certain conditions of the Agreement. (P-37, Item 17.) One of the conditions of the agreement was that the products sold to Walmart had to be "genuine" and not "counterfeit, adulterated, misbranded, falsely labeled or advertised or falsely invoiced within the meaning of any applicable [law] and that the products did not "infringe upon or violate any patent, copyright, trademark, trade name, trade dress, . . . any other rights belonging to others, and all royalties owed by [Concept One], if any have been paid to the appropriate licensor." (P-37, Item 13.)

Marcas Modelo informed third party licensees and retailers, including Walmart, that Concept One was no longer an authorized licensee and did not have the right to sell goods bearing the Corona trademarks. (P-100, P-101.) Therefore, Walmart had the absolute right to cancel its orders under the supplier agreement. Accordingly, Walmart's exercise of its right to

cancel the orders cannot be a breach of contract as a matter of law. *See, e.g., Kirch*, 449 F.3d at 402 (affirming dismissal of tortious interference with contract claim where plaintiff did not allege that contract was actually breached by third party); *Orange County Choppers, Inc. v. Olaes Enter., Inc. d/b/a ODM*, 497 F. Supp. 2d 541, 562 (S.D.N.Y. 2007) (tortious interference with contract counterclaim dismissed where defendant alleged that third party revoked the contract, not that the contract was breached); *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 481 (S.D.N.Y. 1997) (rulings of New York Court of Appeals and Second Circuit have consistently held that to establish a claim for tortious interference with contractual relations, a third party must breach the contract after being induced to do so by defendant).

### b.    Plaintiffs' Alleged Interference Was Justified

Concept One will also not be able to establish at trial that Plaintiffs "improperly" interfered with its contractual relations.  Plaintiffs, the owner and exclusive licensor of the Corona trademarks, had the absolute right to notify third party licensees and retailers that Concept One was no longer an authorized licensee of Corona-branded goods.  This effort to protect the goodwill of the Corona trademarks and prevent consumer deception was not improper, but rather, was justified and precludes a claim that Plaintiffs "improperly" interfered with Concept One's contractual relations.  *See, e.g., P. Kaufmann, Inc. v. Americraft Fabrics, Inc.*, 232 F. Supp. 2d 220 (S.D.N.Y. 2002); *Vigoda v. DCA Prods. Plus Inc.*, 293 A.D.2d 265, 266 (1st Dep't 2002) (manager's letter informing concert organizer that it no longer represented band was not tortious interference with contract).

In sum, Concept One will not be able to establish at trial that Marcas Modelo tortiously interfered with its contract with Walmart.

### C.    PLAINTIFFS' DAMAGES

#### 1.    Damages for Trademark Infringement and Unfair Competition

Damages for violation of 15 U.S.C. § 1125(a) are governed by 15 U.S.C. § 1117(a), pursuant to which Plaintiffs may recover:  "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *Id.*  In exceptional cases, the Court may award reasonable attorney's fees.  *Id.*  The Court has discretion in shaping relief, but "that discretion must operate within legally defined parameters." *George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1537 (2d Cir. 1992).

Plaintiffs are seeking numbers (1) and (3), as well as their attorney's fees.

#### a.    Accounting of Profits

An accounting for profits is available under three rationales:  (i) the defendant is unjustly enriched, (ii) the plaintiff has sustained damages from the infringement, or (iii) if an accounting is necessary to deter a willful infringer from again infringing.  *See, e.g., George Basch Co.,* 968 F.2d at 1537.  Actual confusion need not be proven. *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 745 n.9 (2d Cir. 1998).

Plaintiffs seek an accounting of profits under numbers (i) and (iii).

There is recent authority that proof of willfulness is not a prerequisite to an award of accounting of profits. *See, e.g., Nike, Inc. v. Top Brand Co.,* No. 00 Civ. 8179, 2005 WL 1654859, *8 (S.D.N.Y. July, 13, 2005) (interpreting language of statute and finding that "willfulness is not a prerequisite to recovery of profits for violations under Section 1125(a)"); *Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 174-75 (3d Cir. 2005) (holding that willfulness is not a prerequisite to an award of infringer's profits and holding that its prior precedent has been superseded by the 1999 amendment); *Quick Techs., Inc. v. Sage Group PLL,* 313 F.3d 338, 347-

9 (5th Cir. 2002) (declining to adopt a bright line rule in which a showing of willful infringement is a prerequisite to an accounting of profits); *Burger King v. Mason*, 855 F. 2d 779, 781 (11th Cir. 1988) ("Nor is an award of profits...dependent upon a higher showing of culpability on the part of defendant, who is purposely using the trademark.); *Roulo v. Russ & Berrie & Co., Inc.*, 886 F.2d 931, 941 (7th Cir. 1989) ("Other than general equitable considerations, there is no express requirement...that the infringer willfully infringe the trade dress to justify an award of profits."). In any event, there is overwhelming evidence of willfulness, as detailed in the Facts section above.

Courts have regularly awarded profits upon finding willful and deliberate infringement, and this Court should do likewise. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 253 (S.D.N.Y. 2004) (accounting justified because defendants unjustly enriched and acted in bad faith); *Gucci America, Inc. v. Dart, Inc.*, 715 F. Supp. 566, 568 (S.D.N.Y. 1989) (Court awarded defendant's profits (trebled) for willful and deliberate infringement); *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F. Supp. 947, 960 (S.D.N.Y. 1980) (accounting for profits justified where licensee sold goods, not covered by license, with trademark and licensor's name on them); *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 1980 U.S. Dist. LEXIS 16290 at *21 (S.D.N.Y. Mar. 5, 1980) (plaintiff entitled to accounting for damages for willful infringement).

In the context of a licensee such as Concept One who continues to sell product after termination of a license agreement, Courts have held that the licensor is entitled to the defendant's profits subsequent to termination of the license. *See, e.g., Bowmar Instrument Corp.*, 497 F. Supp. at 960; *see also Burger King Corp. v. C.R. Weaver*, 169 F.3d 1310, 1321-22 (11th Cir. 1999) (award of lost profits for infringement by terminated franchisee).

### b.    Enhanced Damages

The Court has authority to increase its award of profits if it finds it to be inadequate, and there is no statutory cap to the award. *E.g., Deering, Milliken & Co., Inc. v. Gilbert,* 269 F.2d 191, 194 (2d Cir. 1959) (given deliberate and fraudulent nature of infringement, Second Circuit would not have found it to be abuse of discretion had trial court trebled the defendant's profits, measured by plaintiff's minimum license fee that defendant "saved" through its infringement; no statutory cap to court's authority to increase its award of profits).

Any award here should be increased because this case involves a deliberate, intentional, continuous theft of Plaintiffs' Corona trademarks. *See, e.g., Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 436 (7th Cir. 1989) (treble damages awarded to franchisor where franchisee knowingly and deliberately continued to use trademark after franchise was terminated); *Gucci America, Inc. v. Dart, Inc.,* 715 F. Supp. 566, 568 (S.D.N.Y. 1989) (court trebled defendant's profits for willful and deliberate infringement).

### c.    Punitive Damages

To obtain punitive damages, Plaintiffs must demonstrate the existence of "circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton." *Prozeralik v. Capital Cities Communications, Inc.,* 82 N.Y.2d 466, 479, 605 N.Y.S.2d 225-26 (1993) (quoting Prosser and Keeton, Torts § 2, at 9-10 (5th ed. 1984)).

In the case at bar, as discussed *supra* the conduct of Concept One will be proven to have been fraudulent and outrageous, warranting a punitive damage award, in that they (i) ignored clear, unambiguous language of the License Agreement so as to profit wrongfully, (ii) sold

- 25 -

products that were not approved under the License Agreement, (iii) sold products bearing

designs that were not approved under the License Agreement, (iv) continued to sell Corona-

branded products after its License Agreement was terminated; (v) failed to pay royalties on any

products they sold in contravention of its counsel's advice; and (vi) knowingly submitting a

falsified royalty report.

### d.    Attorneys' Fees

Under Section 1117(a), "an award of attorneys' fees lies within the sound discretion of

the trial court." *George Basch Co., Inc.,* 968 F.2d at 1542. Because Concept One's

infringement was deliberate, willful, and continuing, Plaintiffs should be awarded attorneys' fees.

*See San Francisco Arts & Ath. v. United States Olympic Committee,* 483 U.S. 522, 530 (1987)

(recovery of profits, damages, costs and attorneys' fees typical in cases of trademark

infringement); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1232 (10th

Cir. 2000) (attorneys' fees properly awarded where infringement was malicious, fraudulent,

deliberate and willful"); *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431,

436 (7th Cir. 1989) (attorneys' fees awarded to franchisor where franchisee knowingly and

deliberately continued to use trademark after franchise was terminated); *Getty Petroleum Corp.*

*v. Bartco Petroleup Corp.,* 858 F.2d 103, 113 (2d Cir. 1988) (award of attorneys' fees for willful

trademark infringement affirmed); *Lon Tai Shing, Co. v. Koch + Lowy,* 1992 U.S. Dist. LEXIS

20783 at *2 (S.D.N.Y. 1992) (awarding attorneys' fees for willful trademark infringement);

*Bowmar Instrument Corp. v. Continental Microsystems, Inc.,* 497 F. Supp. 947, 961 (S.D.N.Y.

1980) (attorneys' fees awarded licensor where licensee deliberately sold goods not covered by

license agreement with trademark and licensor's name on them); *Polo Fashions, Inc. v. Extra*

*Special Products, Inc.,* 1980 U.S. Dist. LEXIS 16290 at * 24 (S.D.N.Y. Mar. 5, 1980) (attorneys' fees awarded for "malicious, fraudulent, deliberate and/or willful" infringement).

### e.    Injunctive Relief

Plaintiffs will be entitled to a permanent injunction to stop Defendant from using the Corona trademarks.  Indeed, to this day, Concept One continues to advertise and promote goods bearing the Corona marks on its website.  (P-27.)

### D.    Damages for Breach of Contract and Attorney's Fees

Plaintiffs will be entitled to a permanent injunction.  Marcas Modelo is also entitled to recover under the License Agreement, its reasonable attorney's fees and the costs of bringing the action.  (P-16, § 12.2.)

### CONCLUSION

Based upon the foregoing, Plaintiffs respectfully submit that following trial judgment should be entered in their favor on all counts.

Dated: New York, New York
       August 11, 2008

Respectfully submitted,

K&L GATES LLP

By: _Joanna A. Diakos_

Darren W. Saunders (DS 0456)
Joanna A. Diakos (JD 7269)
599 Lexington Avenue
New York, NY  10022
Tel:  (212) 536-3900
Fax:  (212) 536-3901

*Attorneys for Plaintiffs Cerveceria Modelo, S.A. de C.V. and Marcas Modelo, S.A. de C.V.*