# LICENSE AGREEMENT

PROCERMEX, INC., a Texas corporation (hereinafter "LICENSOR"), and
**CONCEPT ONE ACCESSORIES**, a New York Corporation
(hereinafter "LICENSEE"), agree as follows:

1. <u>Definitions</u>

    1.1 "SUBJECT MARKS" means the trademarks and related designs shown in Exhibit A and any other marks or designs incorporating any of those trademarks.

    1.2 "LICENSED PRODUCTS" means any product or part thereof listed in Exhibit B.

    1.3 "TERRITORY" means the United States of America and its possessions, but not including Puerto Rico or the Virgin Islands.

    1.4 "NET SALES PRICE" means LICENSEE's gross sales price for LICENSED PRODUCTS less actual quantity discounts and returns. No deduction shall be made for cash payments, uncollectible accounts or other discounts. Viable proof of uncollectible accounts or other discounts shall be provided to LICENSOR. No costs incurred in the manufacture, sale, distribution or promotion of the LICENSED PRODUCTS shall be deducted in computing NET SALES PRICE.

    1.5 "PARTY" means either, and "PARTIES" means both, of LICENSOR and LICENSEE.

2. <u>Grant of License</u>

    2.1 Subject to the terms of this Agreement, LICENSOR hereby grants LICENSEE a limited, revocable, non-exclusive authorization and license to use the SUBJECT MARKS in the manufacture, sale and distribution of the LICENSED PRODUCTS in the TERRITORY, but only in such form and manner as approved in advance by LICENSOR under Section 3 of this Agreement.

    2.2 No License is granted hereunder for the use of the SUBJECT MARKS for any purpose other than upon or in connection with the LICENSED PRODUCTS. No license is granted to LICENSEE hereunder for the manufacture, sale or distribution of LICENSED PRODUCTS to be used as a premium. "Premium" means any product given free or sold at less than its customary selling price for the purpose of increasing the sale, promotion, or publicizing any other product or any service, including incentives for sales force, trade or consumers. LICENSEE shall not use any of the SUBJECT MARKS in connection with any sweepstakes,

DEFENDANT'S EXHIBIT NO. 1 FOR IDENTIFICATION 3/31/08

lottery, game of chance of any similar promotional or sales device, scheme, or program. In the event LICENSEE desires to sell LICENSED PRODUCTS for such purposes, LICENSEE agrees to obtain, in advance, express written approval to do so from LICENSOR.

3. Quality Standards and Approval

3.1 LICENSEE agrees that the LICENSED PRODUCTS shall conform to such standards and specifications as may be designated in writing from time to time by LICENSOR. LICENSOR may change such standards and specifications in writing at any time. The standards and specifications designated by LICENSOR, and any additions or amendments thereto, shall become effective thirty days after written notice of such standards and specifications to LICENSEE, and all LICENSED PRODUCTS manufactured by or for LICENSEE after that date shall conform to such standards and specifications unless otherwise agreed in writing by LICENSOR.

3.2 For each LICENSED PRODUCT bearing any of the SUBJECT MARKS proposed by LICENSEE under this Agreement, LICENSEE shall submit in advance, to LICENSOR for approval two samples of the LICENSED PRODUCT in the form proposed for sale and distribution by LICENSEE, as well as samples of all packaging, promotional and advertising materials. Each product submitted by LICENSEE for approval shall be accompanied by photographs or drawings in duplicate, approximately 8 X 10 inches in size, which clearly and accurately display all designs and text appearing on the LICENSED PRODUCT. If LICENSOR approves a proposed design of a LICENSED PRODUCT, LICENSOR will give notice of approval to LICENSEE by stamping the photographs or drawings of approved designs and returning one set of the proposed duplicate photographs or drawings to LICENSEE. Unless a proposed design is approved in this manner or is otherwise specifically approved in writing by LICENSOR, the design shall be deemed disapproved. No LICENSED PRODUCT bearing any of the SUBJECT MARKS shall be used, displayed, advertised, offered for sale, sold, or otherwise distributed by LICENSEE unless and until it has been approved by LICENSOR as provided herein. Approval or disapproval of any LICENSED PRODUCT or design shall be in the absolute discretion of LICENSOR.

3.3 The approval of any LICENSED PRODUCT by LICENSOR under Section 3.2 shall not be deemed to constitute the approval of any deviation from the standards and specifications for LICENSED PRODUCTS established by LICENSOR unless the sample submitted by LICENSEE is accompanied by a written statement prominently disclosing the nature of the deviation and the deviation is specifically approved in writing by LICENSOR in addition to the approval of the design of the LICENSED PRODUCT under Section 3.2. The failure of the LICENSEE to disclose in writing a deviation from LICENSOR's standards and specifications shall nullify any approval of that LICENSED PRODUCT by LICENSOR, which shall be deemed void from the outset and of no effect.

3.4 LICENSOR from time to time may amend the procedure for submission and approval of new designs by giving written notice of such amendment to LICENSEE.

2

3.5 After approval by LICENSOR, LICENSEE shall not change the design or quality of any LICENSED PRODUCT, or the appearance or manner of use of a SUBJECT MARK, without the prior written approval of LICENSOR. In the event the LICENSEE creates a new trademark or design through a change in the appearance of a SUBJECT MARK, the new trademark or design shall belong to the LICENSOR, and LICENSEE's usage thereof shall be subject to the same terms and conditions imposed on the usage of all other SUBJECT MARKS under the terms of this Agreement.

3.6 LICENSEE agrees that all LICENSED PRODUCTS sold or distributed by LICENSEE will be the same as, or substantially identical in quality and appearance to, the initial sample approved by LICENSOR. LICENSEE shall maintain reasonable manufacturing, servicing and quality standards to insure that the LICENSED PRODUCTS are consistent with such initial samples. During the term of this Agreement (including the period provided in Section 11 for disposition of inventory following termination of this Agreement), upon prior notice to LICENSEE given by LICENSOR, the duly authorized representatives of LICENSOR shall have the right to inspect the premises of LICENSEE and its operations and inventory during all hours of operations to insure that standards of quality and consistency with approved samples of LICENSED PRODUCTS are being maintained. At the request of LICENSOR from time to time, LICENSEE shall submit to LICENSOR representative current samples and photographs of the LICENSED PRODUCTS which LICENSEE is manufacturing, selling, or distributing.

4. Royalty

4.1 LICENSEE agrees to pay LICENSOR **Eight (8) percent (%)** of the NET SALES PRICE for each LICENSED PRODUCT bearing any of the SUBJECT MARKS sold or otherwise distributed directly by LICENSEE to retailers during the term of this Agreement. If LICENSEE sells or distributes LICENSED PRODUCTS bearing any of the SUBJECT MARKS to beer wholesalers, LICENSEE shall not be required to pay a royalty to LICENSOR. If LICENSEE sells or distributes LICENSED PRODUCTS bearing any of the SUBJECT MARKS to wholesalers, or other intermediate distributors of products, other than beer, who then resell the LICENSED PRODUCT at the retail level, LICENSEE shall pay to LICENSOR a royalty of **Eight( 8) percent (%)** of the NET SALES PRICE on such sales. If LICENSEE at any time pays any other LICENSOR a higher royalty rate or licensing rate than that provided in this Agreement for use in the TERRITORY of any name, mark, slogan or likenesss on the same or similar product, LICENSEE shall immediately notify LICENSOR of such rate, and that higher rate shall automatically and immediately apply to this Agreeement.

4.2 Royalties on sales made during each calendar month shall be paid within fifteen days following the end of that month, i.e., by the fifteenth day of the following month.

4.3 The initial term of this agreement shall be a period commencing on March 15th, 2004 through December 31st, 2005 AND RENEWABLE ON A CALENDAR YEAR BASIS THEREAFTER. LICENSEE SHALL PAY LICENSOR AN ADVANCE MINIMUM ROYALTY OF SIXTEEN THOUSAND DOLLARS ($16,000 USD) PRO RATED AT $14,000. Monthly royalties received by LICENSOR under Section 4.1 of this agreement

shall be credited against the Annual Minimum Royalty for the year in which such monthly royalties are earned. Any balance due on the Annual Minimum Royalty shall be paid within thirty days following the end of each calendar year. To the extent that the term of this Agreement includes one or more partial calendar years, the Annual Minimum Royalty for such calendar year shall be prorated on a daily basis. Any balance due on the Annual Minimum Royalty upon termination of this Agreement shall be paid within thirty days following the termination of the Agreement.

 4.4  If any royalty payment described in Sections 4.1 through 4.3 of this Agreement is not made within the specified time limit, same shall bear interest until paid at the rate of the lower of (a) fifteen percent (%) per year or (b) the maximum legal rate applicable.

 4.5  If it becomes necessary for LICENSOR to undertake legal action to collect any sum due under this Agreement, LICENSEE shall pay all reasonable legal fees and costs incurred by LICENSOR in connection therewith provided such legal action results in a determination that such sum was due LICENSOR.

## 5. *Accounts and Reporting*

 5.1  Each royalty payment made by LICENSEE under Section 4 of this Agreement shall be accompanied by a **written sales report** certified to be accurate by a financial officer of LICENSEE showing the total royalties due to LICENSOR. In addition, the report shall contain an itemized breakdown showing separately each type of LICENSED PRODUCT sold or distributed by LICENSEE: (i) the number sold or distributed at each royalty rate; (ii) the gross sales price(s) at each royalty rate; (iii) any deductions from the gross sales price(s) claimed by LICENSEE; (iv) the NET SALES PRICE at each royalty rate; and (v) the royalties due LICENSOR under this Agreement. The sales report shall be in the format specified by LICENSOR.

 5.2  LICENSEE shall keep accurate accounts showing the manufacture and sale or other distribution of LICENSED PRODUCTS by LICENSEE. Such accounts shall be maintained for at least three years after the payment of the corresponding royalty and shall be available for inspection by duly authorized representatives of LICENSOR during normal business hours.

 5.3  LICENSOR shall have the right to apply all generally accepted auditing standards and procedures to verify the accuracy of LICENSEE's records with respect to the manufacture, sale and distribution of LICENSED PRODUCTS covered by this Agreement. Such audit will be conducted at the sole expense of LICENSOR.

## 6. Use of SUBJECT MARKS

 6.1  LICENSEE shall not state or imply, directly or indirectly, that LICENSEE or LICENSEE's activities are supported, endorsed or sponsored by LICENSOR. LICENSEE shall not use the name of LICENSOR, including, without limitation, its corporate or trade name, in the

4