Sam Hafif

Page 1

```
 1
 2       UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
 3       Civil Action No. 07 CV 7998 (HB)
   ----------------------------------------)
 4 CERVECERIA MODELO, S.A. DE C.V. and
   MARCAS MODELO, S.A. DE C.V.,
 5
                    Plaintiffs,
 6
             vs.
 7
 8 USPA ACCESSORIES LLC d/b/a CONCEPT ONE
   ACCESSORIES,
 9
                    Defendants.
10 ----------------------------------------)
11
12
13
14            DEPOSITION OF SAM HAFIF
15              New York, New York
16           Friday, April 25, 2008
17
18
19
20
21
22
23 Reported by:
24 Toni Allegrucci
25 JOB NO. 202554
```

ORIGINAL

Sam Hafif

Page 124

```
1                S. HAFIF
2     A.   Yes.
3     Q.   And then there's something
4  handwritten which I believe is flip-flops?
5     A.   Yes.
6     Q.   Is there anything after that?
7     A.   T-shirts.
8     Q.   So can you read that?
9     A.   T-shirts.
10    Q.   Oh, T-shirts, okay.  All right.
11         Then you are saying that bags
12 should be on here?
13    A.   Yes.
14    Q.   Is there anything else besides bags
15 that should be on here?
16    A.   I don't believe so, no.
17    Q.   And why do you say that bags should
18 be on Exhibit B of this license agreement?
19    A.   Because, because the original
20 agreement we made with them included bags and
21 they left it off the contract, and then we
22 were told thereafter that they were adding it
23 back to the contract and, in fact, we were
24 told on several occasions that we were, the
25 market was also told that we were the bag
```

Esquire Deposition Services
1-800-944-9454

Sam Hafif

Page 125

1           S. HAFIF
2 licensee.
3     Q.  When you say "the market was told,"
4 are you saying by Marcas Modelo?
5     A.  Yes.
6     Q.  Do you know -- well, first of all,
7 let's go back to the "we were told part."
8         Who told you that bags would be
9 added?
10    A.  Jean Marie Ruffini.
11    Q.  And did she do that verbally or in
12 writing?
13    A.  By e-mail.
14    Q.  And did she affirmatively state
15 we're going to put it back in?
16    A.  Actually both verbally and by
17 e-mail.
18    Q.  Okay.  And do you recall what she
19 said in the e-mail?
20    A.  She said she would have it added to
21 the contract.
22    Q.  But affirmatively that she was
23 going to add it to the contract?
24        MR. TOKAYER: Objection as to form.
25    A.  I don't remember the exact language

Sam Hafif

Page 126

```
1                S. HAFIF
2  she used, but the indication was that it was
3  going to be added back to the contract and
4  that we should continue to develop and sell
5  the product.
6       Q.   Did she say anything else other
7  than that?
8       A.   No.  Well, I don't recall the
9  specifics, you know, the details of the
10 conversation.  It was back in January of last
11 year.
12      Q.   Do you recall whether anyone other
13 than Jean Marie Ruffini stated that bags
14 would be added to the contract?
15      A.   I don't recall.
16      Q.   Now, let's go to the other part,
17 the trade was told, is that what you said?
18      A.   Yes.  I believe he said the
19 "market."
20      Q.   The "market," okay.
21           Who did tell the market that
22 Concept One was licensed to sell bags under
23 the Corona trademark?
24      A.   A list of licensees was sent out to
25 the other licensees, as well to certain
```

Sam Hafif

Page 127

```
 1                S. HAFIF
 2  retailers listing all of the approved
 3  licensees for 2007 and listing the product
 4  classifications that they were licensed for,
 5  and under Concept One it listed specifically
 6  bags, it was circulated throughout the
 7  market.
 8       Q.   So you are saying this was a
 9  memorandum or some type of document that was
10  actually prepared by Marcas Modelo?
11       A.   Yes, it was a licensee list.  It
12  was an approved licensee list for 2007
13  listing the companies and the product class,
14  contacts and the product classifications that
15  they were licensed for.
16       Q.   Do you recall the purpose, the
17  purpose of the document?
18       A.   Yes.  It was in order to inform the
19  marketplace of who, because they had culled
20  back their license, they had cut back their
21  approved licenses.  And so there was a lot of
22  question in the marketplace in terms of who
23  was authorized and who was not authorized.
24  So they created, I believe they created this
25  document in order to clarify for the
```

Sam Hafif

Page 128

```
 1              S. HAFIF
 2  retailers who would be licensed in what
 3  product categories, and they gave it to us in
 4  order to circulate to our customers, we did.
 5       Q.   Okay.  Do you recall who actually
 6  sent out the document?
 7       A.   I got a copy from Juan Fernandez
 8  and I believe a copy was sent by Jean Marie
 9  to Tara in my licensing department.
10       Q.   Does Concept One have a category of
11  products that it refers to as "juniors"?
12       A.   No, juniors means women's, it's not
13  a category.  Girls is children's, juniors is
14  women's.
15       Q.   Okay.  Is that an industry term or
16  in your company?
17       A.   It's an industry term.
18       Q.   All right.  So juniors, it refers
19  to young women?
20       A.   Yeah.  For example, Mandy shops is
21  a juniors chain.  Limited Too is a children's
22  chain or Kids 'R Us is a children's chain.
23  Children's Place, children's chain.  What's
24  another juniors, Forever 21 is a juniors
25  chain.  Are you familiar with Forever 21?
```

Sam Hafif

Page 129

1           S. HAFIF
2      Q.   Okay.
3      A.   In the mass merchants and in the
4 department stores they have separate buyers
5 for children's products and for adult
6 products, the adult buyers buy the juniors
7 products, juniors is adult.
8      Q.   Okay. That's helpful, okay.
9           Going back to the list that you
10 received from Juan Fernandez of the licensees
11 of Marcas Modelo and the products, did you do
12 anything with that list?
13     A.   What do you mean did we do
14 anything?
15     Q.   Did you give it to anyone, show it
16 to anyone?
17     A.   I'm sure, we used it for selling
18 purposes. At the time there was a lot of
19 confusion in the marketplace as to who was an
20 authorized licensee and for what categories.
21 So in order for us to obtain sales we used
22 whatever, everything that they gave us as a
23 selling tool, so I'm sure that was used.
24     Q.   Okay so when you say "used as a
25 selling tool," you mean showing it to your

```
 1                    S. HAFIF
 2   customers?
 3        A.   Yes.
 4             MR. SAUNDERS:  Please mark the next
 5        exhibit.
 6             (Hafif Exhibit 5, document, marked
 7        for identification, as of this date.)
 8        Q.   Is that Exhibit 6 I just handed you
 9   -- oh, 5?
10        A.   Five.
11        Q.   Do you recognize Exhibit 5?
12        A.   Yes.
13        Q.   It's a string of e-mails, correct?
14        A.   Yes.
15        Q.   And if you look on the second
16   page of the exhibit, in the lower e-mail,
17   that's an e-mail from Jean Marie Ruffini to
18   you, correct?
19        A.   Yes.
20        Q.   Dated Wednesday, November 1st?
21        A.   Yes.
22        Q.   Is this one of the e-mails that you
23   were referring to just a little while ago
24   regarding adding bags to Exhibit B of the
25   Marcas Modelo license agreement?
```

1               S. HAFIF
2          MR. TOKAYER: Objection.
3     A.   Yes.
4     Q.   Okay. It says "hi Sam, I think we
5  can add these in Exhibit B and e-mail to
6  you;" is that correct?
7     A.   Yes.
8     Q.   On the top of that page there is an
9  e-mail from you to Jean Marie and
10 Juan Fernandez, correct?
11    A.   Yes.
12    Q.   And that looks like it's from
13 March 14, 2007?
14    A.   Yes.
15    Q.   All right. And then you say "Dana
16 told me that some bags are being rejected as
17 'not in contract.' Please see below where
18 you said you would add bags back in."
19         Did I read that, right?
20    A.   Yes.
21    Q.   So are you saying that, in this
22 e-mail are you saying that you understood
23 Jean Marie Ruffini's e-mail of November 1st
24 as definitively stating to you that bags
25 would be added back in to Exhibit B?

Sam Hafif

Page 132

1          S. HAFIF
2     A.   No.
3     Q.   So what are you saying?
4     A.   So what I'm saying is, I was
5  referring to this e-mail below in my
6  correspondence to them, telling them that
7  this, telling us that they were going to add
8  bags back in, but that's not the assumption
9  that we worked, the assumption wasn't based
10 on this e-mail, it was based on the ongoing
11 business and bags that we were doing for the
12 entire timeframe from November 1st until that
13 date and not once were we told bags were not
14 being put back in until this letter rejecting
15 everything, okay.  So it wasn't based on the
16 e-mail, it was based on the e-mail, plus the
17 fact that we were continuing, producing a
18 category that was in the prior contract, that
19 we were told was being put back in.  That was
20 on -- that we were clearly authorized for in
21 their distribution list that they sent around
22 to everybody, okay.  That was the assumption,
23 not based on this e-mail.
24    Q.   Okay.  All right.  But if we just
25 focus on the e-mail for a second, would you

Sam Hafif

Page 133

```
 1                S. HAFIF
 2  agree that it does not definitively state
 3  that bags would be added to Exhibit B?
 4            MR. TOKAYER:  Objection.
 5       A.   Okay.
 6       Q.   I'm just focusing on the e-mail?
 7       A.   It says I think we can add in
 8  Exhibit B an e-mail to you, it doesn't say
 9  they did it, it says they were going to do
10  it.
11       Q.   Okay.  And do you know whether you
12  had discussions with Jean Marie after this
13  e-mail, after November 1, 2006?
14       A.   Specifically regarding bags -- I
15  had a lot of discussions with Jean Marie.
16       Q.   I know.  Specifically regarding
17  adding bags to Exhibit B?
18       A.   No, not until we started getting
19  rejections.
20       Q.   And did you have discussions with
21  anyone other than Jean Marie?
22       A.   Regarding bags?
23       Q.   Yes.
24       A.   Yes.
25       Q.   Who?
```

```
 1      A.    Juan S. Marir Fernandez.
 2      Q.    Do you recall when?
 3
 4      A.    I believe it was in February we
 5 made a trip down to San Antonio to meet with
 6 Juan, and we presented products at that
 7 meeting and some of the products that were
 8 presented were bags, so he was aware that we
 9 were producing bags.
10      Q.    February 2007?
11      A.    Yes.  I don't know the exact date.
12      Q.    Did you have any discussions with
13 anyone other than Jean Marie and Juan about
14 adding bags to Exhibit B?
15      A.    We didn't have any contact with
16 anybody else at the company besides
17 Jean Marie and Juan.
18      Q.    Ever?
19      A.    Nope, never.  Tried, sent letters,
20 never got responses.
21      Q.    No, but I'm saying in your
22 day-to-day business, before this dispute, did
23 you have any contacts just in your ordinary
24 course of business with anyone other than
25 Jean Marie and Juan Fernandez?
```