UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                :
CERVECERIA MODELO, S.A. DE C.V. and         :
MARCAS MODELO, S.A. DE C.V.,                         :
                                                                : Civil Action No. 07 CIV 7998
                              Plaintiffs,              :
                                                                :
       -against-                                            :
                                                                :
USPA ACCESSORIES LLC d/b/a CONCEPT ONE    :
ACCESSORIES,                                            :
                                                                :
                              Defendants.           :
                                                                :
                                                                :
-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE DEFENDANT'S EXPERT WITNESS BETH SCHLANSKY

       Pursuant to Rule 702 of the Federal Rules of Evidence, Plaintiffs Cerveceria Modelo,

S.A. de C.V. and Marcas Modelo, S.A. de C.V. hereby move to preclude any expert testimony at

trial based on the August 18, 2008 report by Beth Schlansky (the "Schlansky Report")[1],

defendant Concept One's expert witness on licensing.

       Ms. Schlansky is a licensing consultant who was retained by the defendant to testify

regarding her opinions on the quality of the defendant's products and on Marcas Modelo's

approval and licensing procedures.  Ms. Schlansky should be excluded from testifying at trial for

the following reasons:

- she did not utilize any objective methodology or reasoning to reach her
  conclusions, but merely stated subjective opinions;

- the defendant and its counsel had substantial input into her work and conclusions,
  offering only selective information that skewed her findings; and

---

[1] A copy of the Schlansky Report is attached as Exhibit A.

• she drew inappropriate legal conclusions.

Federal Rule of Evidence 702 specifies that expert witness testimony is only admissible if (i) the testimony is based upon sufficient facts or data; (ii) the testimony is a product of reliable principles and methods; and (iii) the [expert] witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.; *see also Daubert*, 590 U.S. at 590-95. When faced with a proffer of expert testimony, the court performs a "gate-keeping" function to ascertain whether the testimony aids the trier of fact, rests on a reliable foundation, and is relevant to the facts of the case. *See Lava Trading Inc. v. Hartford Fire Ins. Co*., No. 03 Civ. 7037(PKC), 2005 WL 4684238, at *9-10 (S.D.N.Y. Apr. 11, 2005), citing *Daubert*, 509 U.S. at 589-93. Even if the expert's methods and theories are not "purely scientific," as in the case here, "the court should follow the same approach, adapting the *Daubert* criteria as needed for the purpose of assessing reliability." *Lava Trading,* at *9, *citing Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999). In addition, it is well settled that "experts may not invade the court's province by testifying on issues of law." *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, *1 (S.D.N.Y. 2002).

## A.    Ms. Schlansky Failed To Use Any Objective Reasoning Or Methodology

Ms. Schlansky did not conduct any objective research that is capable of being checked or reproduced. Specifically, Ms. Schlansky visited Concept One's showroom and apparently reviewed a number of items that Concept One selected for her review in a conference room (Schlansky Dep. p. 45).[2] Ms. Schlansky simply looked at the products and did nothing else (Schlansky Dep. p. 46). She did not make any notes or prepare a written summary of what products she examined or what she did (Schlansky Dep. p. 45). She merely concluded verbally

---

[2] References to "Schlansky Dep." refer to the deposition of Beth Schlansky taken on August 21, 2008. The referenced pages from the rough transcript are attached as Exhibit B.

to the defendant and its counsel that the products were of "good quality" and "excellent styling" (Schlansky Dep. p. 47), and that the products "looked great" (Schlansky Dep. p. 76). *See also* Schlansky Report ¶ Q.

Ms. Schlansky confirmed that she did not conduct any objective research. For example, she did not conduct a blind study to have others examine the products without knowing the purpose of the examination:

> Q: But you didn't utilize any neutral people who had no idea of what the purpose was of the inspection to go look at the products and then report to you, is that correct?
>
> A: No, I did not.

Indeed, she did no research whatsoever. (Schlansky Dep. pp. 169-170). Rule 702 requires that an expert's testimony rest on "knowledge," a term that "connotes more than subjective belief or unsupported speculation." *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (holding inadmissible expert testimony based on "personal, subjective views"). The Schlansky Report, void of any discernable foundation in research or reasoning, therefore stands as an unsubstantiated set of speculative and conclusory assertions. Such unreliable testimony would unfairly mislead the jury and unduly prejudice plaintiffs and therefore should not be admitted.[3]

## B.    Ms. Schlansky Relied On Incomplete Facts Provided By Defense Counsel

In the expert report, Ms. Schlansky focuses on the period January 1 through March 23, 2007 in providing her opinions on Marcas Modelo's approval procedures, and she states that Concept One had not received any approvals through this date. The March 23, 2007 date was

---

[3]    The objectivity of Ms. Schlansky's conclusions is brought into further question by the fact that she has worked with Concept One as a licensing consultant for a major national retailer (Schlansky Dep. pp. 12-14, 43).

selected and given to Ms. Schlansky by her trial lawyer (Schlansky Dep. p. 164). The lawyer did not explain to Ms. Schlansky why he selected that date nor did Ms. Schlansky ask counsel why that date was selected as the cut-off (Schlansky Dep. p. 165). It appears that the date was selected to suit counsel's arguments, since during the next week on March 28, 2007, Concept One had received a number of approvals from Marcas Modelo. *See* Trial Exhibit D-Q (Attached as Exhibit C). Moreover, Ms. Schlansky confirmed that defendant's trial lawyer had input into the report and that she received comments from him on a number of occasions and, in some instances, made changes to the report based on counsel's comments (Schlansky Dep. pp. 72-73).

An expert should not rely solely on the unsupported representations of his client. *See Lava Trading Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037(PKC), 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005); *see also King v. Brandtjen & Kluge, Inc.*, No. 94-cv-411(M), 2001 WL 1804345 (W.D.N.Y. 2001) (precluding expert testimony as unreliable in part because the expert "blindly endorses" the plaintiff's version of the facts.) Here, Ms. Schlansky has blindly endorsed defendant's rendition of the facts without any independent investigation or analysis. Ms. Schlansky's selective knowledge of the facts renders her report unreliable, confusing, and inadmissible.

**C.    Ms. Schlansky Has No Legal Training Yet Her Report Draws Legal Conclusions**

Ms. Schlansky is not a lawyer and has no legal training in contract law or contract interpretation (Schlansky Dep. p. 57). Even if Ms. Schlansky was a lawyer or had legal training, it would be improper for her to invade the Court's province by testifying on issues of law. *LinkCo., Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, *1 (S.D.N.Y. 2002). However, Ms. Schlansky purports to proffer legal opinions on whether Marcas Modelo allegedly violated the license agreement:

> The failure to approve a 2007 design on the basis that it may be
> sold in 2008 pursuant to the contract's sell-off period is in direct
> violation of the terms of Concept One's license agreement with the
> licensor of the Corona brand.

(Schlansky Report ¶ T)

While "an expert may provide an opinion to help a jury or a judge understand a particular fact, he may not give testimony stating ultimate legal conclusions based on those facts." *LinkCo, Inc.*, 2002 WL 158551, at *3. Ms. Schlansky's assertions that plaintiff violated the terms of the license agreement are therefore improper and inadmissible.

### Conclusion

The Schlansky Report offers nothing more than unsubstantiated, speculative assertions, all without any objective methodology, and proffers legal conclusions based on incomplete information that would serve to unfairly prejudice plaintiffs and mislead the jury. This Court's gatekeeping function under Rule 702 and *Daubert* requires exclusion of such unreliable and prejudicial testimony. Accordingly, plaintiffs respectfully request that the Court grant this motion to exclude defendant's expert witness Beth Schlansky.

Dated: New York, New York
      August 22, 2008

                        Respectfully submitted,

                        K&L Gates LLP

                        By: _____

                            Darren W. Saunders (DS 0456)
                            Joanna A. Diakos (JD 7269)
                            599 Lexington Avenue
                            New York, NY 10022
                            Tel.:  (212) 536-3900
                            Fax:  (212) 536-3901

                        *Attorneys for Plaintiffs.*

# EXHIBIT A

IRA DANIEL TOKAYER, ESQ. (IT-4734)
Attorney for Defendant
42 West 38th Street, Suite 802
New York, New York 10018
(212) 695-5250

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

CERVECERIA MODELO, S.A. DE C.V.       :   07 CV 7998 (HB)
and MARCUS MODELO S.A. DE C.V.,
                                      :
                    Plaintiffs,
                                      :
          -against-                       EXPERT REPORT
                                      :
USPA ACCESSORIES LLC d/b/a
CONCEPT ONE ACCESSORIES,              :

                    Defendant.        :

------------------------------------x

          PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P.

26(a)(2), defendant submit the following Report of Beth

Schlansky, an expert witness who may testify at trial:

                    OPINIONS AND CONCLUSIONS

1.    Qualifications and Publications

          My name is Beth Schlansky.  I am a self-employed

licensing consultant.  For over thirty years I have worked in the

retail and licensing fields, with experience on both the licensor

and licensee side.

          My experience and qualifications are set forth in the

attached resume (Ex. A).  I have also attached a list of my

publications (Ex. B).  I have not testified as an expert at trial

or by deposition in the preceding four years.

2.  Basis for Conclusions

My opinions are based upon my training and experience, my review and analysis of documents produced and/or made available and testimony developed in the course of this litigation and my visit to the offices of Concept One. I am informed that discovery is ongoing and I reserve the right to revise my opinions and conclusions if relevant additional information becomes available.

3.  Opinions and Conclusions

A.  Based on my knowledge of Concept One's reputation in the industry, the licenses I observed Concept One has, the retailer stores in which I have seen Concept One's products, and my review and observations of Concept One's products, Concept One is a leading licensee with significant experience and expertise in the marketing, production and distribution of quality apparel products.

B.  Concept One possesses a valuable roster of licenses, including brand licenses with some of the largest companies in America, such as Major League Baseball, Budweiser, Levi Strauss, McDonald's, Pepsi, Chevrolet and others.

C.  Concept One is a leading distributor to the largest retailers in the United States including Walmart, K-

2

Mart, JCPenny, Target, Macy's and Spencer Gifts.

D.   Concept One would not have obtained such valuable licenses and retail relationships unless it had a proven track record for experience and expertise in the production and marketing of quality products.

E.   Licensing is a multi-billion dollar industry.  It works because of the benefits licensing affords to the licensor, licensee and retailer.

F.   The benefits to the licensor are that, without the need to make a further investment in its property, it receives:

   •   increased exposure to and awareness of its property;

   •   the extension of its property into a variety of products and markets in which it does not otherwise have an expertise; and

   •   revenues through royalties; among other things.

G.   The benefits to the licensee of a licensing arrangement is increased sales of products, among other things.

H.   Based on my experience as a licensee and licensing agent, among other things, it is my opinion that to ensure a successful license arrangement which is beneficial to both licensee and licensor, a licensee must make substantial investment in:

3

- designers and developers of product;

- an experienced sales force;

- administrative personnel;

- a showroom;

- trade shows;

- manufacturing, warehousing and shipping capablities;

- information systems; and

- communications systems; among other things.

I.   Based on the quantity of skus (or styles) submitted by Concept One in 2007 and previously, I conclude that Concept One has made a significant investment in connection with its license arrangement with the licensor of the Corona brand.

J.   It is customary and expected in the licensing industry that a licensor not unfairly interfere with a licensee's efforts to develop, market, manufacture, sell and distribute products under a license arrangement.

K.   Such interference can prevent a licensee from recouping its investment and harm a licensee's relationship with its retail customers who count on the licensee to meet their sales and inventory plans, among other things.

M.   In the licensing industry, the approval process is not

4

and should not be used to impede the ability of the
licensee to realize the benefits of its license
agreement, even if the contract provides that approval
shall be in the absolute discretion of the licensor.

N.    If the licensor of the Corona brand failed to approve
any Concept One's designs in the period February
through March 23, 2007; failed to approve the
overwhelming majority of other designs submitted by
Concept One after March 23, 2007; rejected many of
Concept One's designs without providing any reason to
Concept One; rejected Concept One's designs based upon
standards which were applied in violation of the
license agreement which provides, among other things,
that any changes to licensor standards and
specifications shall become effective thirty days after
written notice to licensee; and failed to fully review
any designs after March 31, 2007; among other things,
then the licensor of the Corona brand unfairly impeded
the ability of Concept One to realize the benefits of
its license agreement.

O.    Such interference with Concept One's efforts to
develop, manufacture, sell and distribute products
would have prevented Concept One from recouping its
investment and affected Concept One's relationship with

5

its retail customers.

P.    The Corona-branded designs submitted by Concept One in 2007 were quality designs, not inferior in design to other Corona-branded designs previously approved by the licensor of the Corona brand.

Q.    The Corona-branded products produced by Concept One for sale in 2007 were quality products, not inferior in design, material or construction to other Corona-branded products previously approved by the licensor of the Corona brand.

R.    The designs and products designated BACO 8080, 8075, 7084 and 7127 were quality designs which conformed to the quality standards set forth in the parties' licensing agreement and the Policies and Procedures Manual.

S.    The designs and products designated BACO 8080, 8075, 7084 and 7127 were in no way inferior to flip-flop designs purportedly submitted by others, including Bioworld, in 2007.

T.    The failure to approve a 2007 design on the basis that it may be sold in 2008 pursuant to the contract's sell-off period is in direct violation of the terms of Concept One's license agreement with the licensor of the Corona brand.

6

7

BETH SCHLANSKY

Dated:  New York, New York
        August 18, 2008

# EXHIBIT B

204995-082108-ROUGH.txt

4

1        ROUGH TRANSCRIPT -- DO NOT QUOTE

2              MR. SAUNDERS:  Let's mark this.

3              (Plaintiff's Exhibit 1, subpoena,

4        was marked for identification, as of this

5        date.)

6  B E T H    S C H L A N S K Y, called as a

7        witness, having been duly sworn by a

8        Notary Public, was examined and testified

9        as follows:

10  EXAMINATION BY

11  MR. SAUNDERS:

12       Q.    Please state your name and address

13  for the record.

14       A.    Beth Schlansky, at 446 East

15  86th Street, New York, New York 10028.

16       Q.    Good afternoon, Ms. Schlansky.  Are

17  you represented by counsel today personally?

18       A.    No.

19       Q.    No?

20       A.    No.

21       Q.    Okay.  I would like to show you

22  what's been marked as Exhibit 1 and ask you if

23  you've seen that before today?

24              (Witness looks at exhibit.)

25       A.    Yes.

5

1        ROUGH TRANSCRIPT -- DO NOT QUOTE

2        Q.    Do you recall when you first saw it?

204995-082108-ROUGH.txt

24   at that aspect of this.

25        Q.    Do you recall approximately what

                                                    12

1             ROUGH TRANSCRIPT -- DO NOT QUOTE

2    month that was?

3        A.    Probably -- I'm going to take a

4    guess -- February, March, in that time period.

5    End of February, March.  I'm taking a guess.

6        Q.    And you said that you had known Sam

7    from --

8        A.    The industry.

9        Q.    -- the industry.

10             Was that from your experience at

11   Spencer's?                                        .

12       A.    It was more as my independent

13   business.

14       Q.    So -- I'm sorry, go ahead.

15       A.    It's more recent than it is back in

16   Spencer days.

17       Q.    So let me ask you a different

18   question then.  When did you first meet

19   Mr. Hafif?

20       A.    Probably at a trade show as I was

21   working his booth with my retail client.

22       Q.    And how long ago was that

23   approximately?

24       A.    Within the last two years.

25       Q.    Do you recall what trade show it

204995-082108-ROUGH.txt

13

1          ROUGH TRANSCRIPT -- DO NOT QUOTE

2  was?

3          A.    Probably Magic.  Which is held in

4  Vegas.

5          Q.    That's the big one in the industry?

6          A.    That's the one that's happening next

7  week.

8          Q.    And when you say working did you say

9  working his booth is that what you said?

10         A.    Yes, working his booth that means I

11 was there with my retail client reviewing his

12 line.

13         Q.    So who was your retail client?

14         A.    My retail client is Trans World

15 Entertainment.

16         Q.    And what is Trans World

17 Entertainment?

18         A.    Trans World Entertainment has 800

19 stores, they are retailers who are in the music

20 entertainment business and I consult for them in

21 their license product area which includes

22 wearables and collectibles.

23         Q.    And what type of consulting do you

24 do, what is the nature of the consulting?

25         A.    For Trans World?


14

1          ROUGH TRANSCRIPT -- DO NOT QUOTE

2          Q.    Yes.

204995-082108-ROUGH.txt

3       A.     I am in constant communication with

4    them on a daily basis.  I represent them in

5    discussions with licensors and licensing agents

6    I help them strategize their business, I advise

7    them on opportunities whether they be licenses

8    or manufacturers that I feel are appropriate for

9    their line of business.

10      Q.     Okay.  And did you say they're a

11   retailer?

12      A.     Yes.  800 stores.

13      Q.     800 stores, under that name or what

14   are the names of the stores?

15      A.     No, they brand their stores FYE and

16   Suncoast.

17      Q.     FYE and Sunkist?

18      A.     Suncoast, S-U-N coast.

19      Q.     Okay.  And are they in a particular

20   region of the country?

21      A.     Throughout the United States.

22      Q.     Are they in the northeast at all?

23      A.     Yes.

24             (Discussion off the record.)

25   BY MR. SAUNDERS:


 

                                             15

1       ROUGH TRANSCRIPT -- DO NOT QUOTE

2       Q.     So when did you next did you have

3    another contact with Mr. Hafif after the --

4       A.     After the agreement with financials

5    I then started to work with Mr. Tokayer as my

6    primary contact.

204995-082108-ROUGH.txt

7    his booth.

8        Q.    So your retail client, are they a

9    customer of Concept One?

10        A.    Yes.

11        Q.    How many products do they buy from

12    Concept One roughly?

13        A.    I don't know.

14        Q.    Is it a large quantity?

15        A.    I don't know the number.

16        Q.    You don't, okay.  What types of

17    products do they buy?

18        A.    Hats, flip flops, perhaps bags I'm

19    not quite sure about bags.

20        Q.    And are these licensed goods?

21        A.    Yes.

22        Q.    Can you give examples of what some

23    of the licenses that your client buys from

24    Concept One?

25        A.    I wouldn't be able to list all of


⬜
                                                43
1          ROUGH TRANSCRIPT -- DO NOT QUOTE

2    them.

3        Q.    No, I mean just examples?

4        A.    Again I didn't I am not prepared to

5    give you the full list and so it's not in my

6    expert witness report, so.

7        Q.    But your client which is -- is it

8    Trans World Entertainment?

9        A.    Trans World Entertainment.

                        Page 35

204995-082108-ROUGH.txt

10      Q.    Your client is a customer of

11 Concept One?

12      A.    Yes.

13      Q.    And do you know how long they've

14 been a customer of Concept One?

15      A.    A couple of years.

16      Q.    What other interactions have you had

17 with Mr. Hafif since the Magic show of two years

18 ago?

19      A.    What do you mean interactions.

20      Q.    Have you dealt with Mr. Hafif in any

21 way since then?

22      A.    Dealt with him what do you mean

23 dealt with him.

24      Q.    Either in business or personally?

25      A.    No.   Trade show contact.


                                              44
1       ROUGH TRANSCRIPT -- DO NOT QUOTE

2       Q.    Trade show, okay.   Have you done any

3 work for Concept One?

4       A.    No other than -- only writing the

5 expert witness report.

6       Q.    Do you know anyone else at

7 Concept One besides Mr. Hafif?

8       A.    I know some of his staff but only

9 through trade show contact.

10      Q.    I see, okay.   Do you consider him

11 a -- do you consider Mr. Hafif a personal friend

12 or a business client?

13      A.    Not a personal friend, a business

204995-082108-ROUGH.txt

14  associate.

15       Q.    All right.  Now, you say at some

16  point you went and visited Concept One's show

17  room here in New York, is that right?

18       A.    Yes.

19       Q.    And what was the purpose of that

20  visit?

21       A.    To look at merchandise.  To look at

22  Corona merchandise.

23       Q.    Right.  And did you look at

24  merchandise?

25       A.    Yes.


                                          45
1         ROUGH TRANSCRIPT -- DO NOT QUOTE

2         Q.    What merchandise did you look at?

3         A.    I looked at hats and I looked at

4   flip flops and a few bags.

5         Q.    And who decided what products you

6   would look at?

7         A.    Concept One displayed product from

8   that -- the period that we're talking about and

9   the prior year, approved product.

10        Q.    So Concept One chose the products

11  that you would look at is that correct?

12        A.    Yes.

13        Q.    And do you recall approximately how

14  many products you looked at?

15        A.    I am going to take a guess and say

16  between 125 to 150 products.

                    Page 37

204995-082108-ROUGH.txt

17      Q.    Actual physical products?

18      A.    Actual physical products.

19      Q.    And then what did you do -- when you

20  looked at these products what did you do next?

21      A.    I don't understand the question.

22      Q.    Did you make any notes or did you

23  just look at them?

24      A.    I slowly examined each product.

25      Q.    And so you didn't make any notes?



⎵
                                        46
1          ROUGH TRANSCRIPT -- DO NOT QUOTE

2      A.    No.

3      Q.    And how long did this process take?

4      A.    I don't know.

5      Q.    Were you there for hours, the full

6  day?

7      A.    I would say probably -- no it wasn't

8  a full day, no.  I don't recall how long.

9      Q.    And do you recall having -- was

10  Mr. Hafif there when you did this analysis?

11      A.    He was in another room.  He was not

12  in the room with me.  He might have been at the

13  front end and at the back end but when I was

14  going through he was not there.

15      Q.    Was Mr. Tokayer there?

16      A.    He too left the room.

17      Q.    Meaning he was physically there in

18  the office?

19      A.    He was in the office, yeah.

20      Q.    And then so what did you do, you

204995-082108-ROUGH.txt

21  visually examined the products is that what you
22  did?
23      A.    Yes.
24      Q.    And then did you do anything else?
25      A.    No.


☐
                                                    47
1          ROUGH TRANSCRIPT -- DO NOT QUOTE

2      Q.    And when you finished visually
3   reviewing the products did you then talk to
4   anyone before you left?
5      A.    A few minutes with Mr. Tokayer and a
6   few minutes with Mr. Hafif.  Just a few minutes.
7      Q.    And in those few minutes what was
8   the gist of what you said?
9      A.    I commented on the good quality, I
10  commented on the excellent styling, and I
11  commented on the excellent way that the Corona
12  trademarks were utilized on the design of the
13  product.
14      Q.    And let's take the last one first.
15  The excellent way that the Corona trademarks
16  were utilized on the product --
17      A.    Mm-hmm.
18      Q.    -- what did you base that on?
19      A.    My experience.
20      Q.    Your personal experience?
21      A.    Yes.
22      Q.    Did you look at anything in writing
23  when you made that determination?

                        Page 39

204995-082108-ROUGH.txt

24        A.    Looked at anything in writing, what

25   does that mean?


⬚
                                                    48
1           ROUGH TRANSCRIPT -- DO NOT QUOTE

2        Q.    Any document, anything that

3   references the Corona trademarks at all?

4        A.    As supplied by who?  I don't

5   understand your question.

6        Q.    I'm just saying you made some

7   determination as to whether the Corona

8   trademarks were displayed properly?

9        A.    Yes, from a design point of view.

10        Q.    From a design point of view?

11        A.    And as well as the legal markings

12   that are necessary.

13        Q.    Right.  And that's what I'm trying

14   to get at.  With respect to the legal markings

15   that are necessary, are you saying you just know

16   that or were you looking at something?

17        A.    Well, remember, I had been given

18   guidelines and I had been given submission forms

19   prior.

20        Q.    Exactly, that's what I'm getting at.

21        A.    But I had been given that at another

22   time.

23        Q.    So you weren't looking at those

24   guidelines that day?

25        A.    No.

204995-082108-ROUGH.txt

24  that you want to clarify at this time?

25       A.    No.

⬚

57

1            ROUGH TRANSCRIPT -- DO NOT QUOTE

2       Q.    Now, you actually answered my next

3  question before the break you said that this is

4  your first time as an expert in a litigation is

5  that right?

6       A.    Yes.

7       Q.    And have you ever been in a

8  deposition before?

9       A.    No.

10       Q.    Lot of firsts.

11             And am I correct that you are not a

12  lawyer?

13       A.    I am not a lawyer.

14       Q.    Have you taken any courses in

15  contract law?

16       A.    No.

17       Q.    How about contract interpretation?

18       A.    No.

19       Q.    Have you taken any courses that deal

20  with license agreements in any way?

21       A.    I have attended industry seminars.

22       Q.    Okay.  What types of seminars?

23       A.    Seminars that are given by industry

24  experts on various subjects that are approved by

25  LIMA L-I-M-A which is the licensing industry

204995-082108-ROUGH.txt

14        A.    No, I don't think that I can take my

15   thought pattern and put it into those two

16   compartments.

17        Q.    Okay.  Do you recall what it is you

18   changed between the first version and the

19   second?

20        A.    Section 3A needed further

21   clarification.

22        Q.    Was that your opinion?

23        A.    Yes.

24        Q.    Or Mr. Tokayer's?

25        A.    My opinion.


                                              72

1          ROUGH TRANSCRIPT -- DO NOT QUOTE

2         Q.    Your opinion, why did it need

3    further clarification?

4         A.    I wanted to clarify why I felt

5    Concept One is a leading licensee.

6         Q.    Now, when you drafted the first

7    report going back to the first report when you

8    drafted it did you then show it to Mr. Tokayer

9    for comment?

10        A.    Yes.

11        Q.    And did he have comments?

12        A.    I don't recall all that he said or

13   not.  I don't recall.

14        Q.    Okay but it was just a yes or no

15   question did he have comments?

16        A.    Yes.

                        Page 61

204995-082108-ROUGH.txt

17      Q.    He did, okay.  And do you recall

18 whether he gave you those comments in some way

19 whether verbally or in writing?

20      A.    Probably verbally.

21      Q.    And what did you do with those

22 comments?

23      A.    Thought about them.

24      Q.    Right.  And then what?

25      A.    Sometimes acted, sometimes didn't.


⬚
                                                73
1          ROUGH TRANSCRIPT -- DO NOT QUOTE

2      Q.    And how many times did that process

3 occur?

4      A.    I don't recall.

5      Q.    Was it more than once?

6      A.    Possibly.

7      Q.    Possibly?

8      A.    Possibly.

9      Q.    I'm just talking about the first

10 report now?

11      A.    Possibly.

12      Q.    So Mr. Gerber gave you --

13          MR. GERBER:  Tokayer.

14      Q.    I'm sorry, Mr. Tokayer gave you

15 verbal comments and then you thought about them,

16 and in some instances you made changes based on

17 those comments?

18      A.    Sometimes.

19      Q.    If you looked at the report can you

20 tell me what changes you made based on

204995-082108-ROUGH.txt

21 Mr. Tokayer's comments?

22      A.   No, I couldn't.

23      Q.   So other than incorporating some of

24 Mr. Tokayer's comments into the first version of

25 the report did you write the entire report

                                              74
1          ROUGH TRANSCRIPT -- DO NOT QUOTE

2 yourself?

3      A.   I wrote the report.

4      Q.   Okay that's what I'm trying to get

5 at did anyone else assist you anyone at your

6 company --

7      A.   No, no.

8      Q.   Are there others at your company?

9      A.   No.  My dog.  Strike that.

10      Q.   Now when the final report was done

11 but not signed, did you again show it to

12 Mr. Tokayer?

13      A.   Of course.

14      Q.   And did he come back with comments

15 at that point?

16      A.   I don't recall.

17      Q.   And just to be clear for the record

18 you made one visit to Concept One to look at

19 products, is that right?

20      A.   I made two.  One was to look at '06,

21 '07, and the second visit was to look at flip

22 flops that had been submitted and those were the

23 two visits.

                    Page 63

204995-082108-ROUGH.txt

76
1        ROUGH TRANSCRIPT -- DO NOT QUOTE

2  for '06?

3        A.    All of the samples were different

4  that I saw.  I saw -- I don't think there were

5  duplications.  I saw a hundred-plus samples.

6        Q.    So that's what I'm trying to get at.

7  When you were comparing the '06 to the '07

8  products were you looking for the two things we

9  discussed earlier, just the quality of the

10  product itself and the display of the trademark?

11       A.    Yes.

12       Q.    Anything else?

13       A.    No.

14       Q.    And with respect to all of the '06

15  products did you find any products that you

16  didn't think were up to the quality standards

17  that you were applying?

18       A.    '06?

19       Q.    Yes.

20       A.    No, '06 products looked great.

21       Q.    All of them, every single one?

22       A.    Yeah, they did.

23       Q.    And same question for '07?

24       A.    '06 and '07 both looked great.

25       Q.    So in other words, out of all the

77
1        ROUGH TRANSCRIPT -- DO NOT QUOTE

2  products that you reviewed, which I think you

Page 65

204995-082108-ROUGH.txt

21  case.

22      Q.     And how does the word "if" do that?

23      A.     In my interpretation of putting if,

24  it was to not refer directly to the case but to

25  say you know to talk about it in a more abstract


⬚
                                                    164
1           ROUGH TRANSCRIPT -- DO NOT QUOTE

2  way, and that's why I did it.

3      Q.     Now, did anyone see this March 23rd,

4  2007 date?

5      A.     Mm-hmm.

6      Q.     Again, who gave you that date?

7      A.     Ira Tokayer.  Ira Tokayer told me

8  about the time period that encompassed all of

9  the submissions in the period that I was looking

10  at.

11     Q.     Do you have any knowledge whether in

12  the following week that Concept One received a

13  number of approvals, do you have knowledge of

14  that from Corona?

15     A.     I know there were some approvals but

16  I don't know the extent of them.

17     Q.     You do know that?

18     A.     I know there were some that were

19  approved but I know it was a small amount I was

20  told there was a small amount that were

21  approved.

22     Q.     But Ira gave you the date?

23     A.     Yes.

204995-082108-ROUGH.txt

24    Q.    Of March 21st, 2007?

25    A.    Yes, Ira Tokayer.  He had given


☐                                                      165

1           ROUGH TRANSCRIPT -- DO NOT QUOTE

2    me -- I asked him what was the period of focus,

3    and that was the period that I was given.

4           Q.    Did he tell you why that was the

5    cutoff date?

6           A.    No, I do not know.

7           Q.    Did you ask him why that was the

8    cutoff date?

9           A.    No, I did not ask him.

10          Q.    Now, the next sentence, failed to

11   approve the overwhelming majority of other

12   designs submitted by Concept One after

13   March 23rd, 2007.

14                Do you know that to be true or is

15   that something you were told?

16          A.    That was something I was told.

17          Q.    So you didn't do any independent

18   investigation to see whether that was true?

19          A.    No, I did not go through the

20   submissions as I had done through that period

21   prior.

22          Q.    Rejected many of Concept One's

23   designs without providing any reason to

24   Concept One?

25          A.    Yes.  On that chart we were looking


                        Page 144

204995-082108-ROUGH.txt

7  products would have prevented Concept One from

8  recouping its investment and affected

9  Concept One's relationship with its retail

10  customers?

11        A.    Yes.

12        Q.    So you conclude that if everything

13  in paragraph N happened, that that constitutes

14  an interference with Concept One's efforts, is

15  that what you are saying?

16        A.    Yes, that's is what I'm saying.

17        Q.    And going back up to paragraph N,

18  you state and fail to fully review any designs

19  after March 31st, 2007 do you see that?

20        A.    Yes and that's what I was informed.

21        Q.    Okay.  So someone told you that?

22        A.    Yes.

23        Q.    Who told you that?

24        A.    Ira Tokayer.

25        Q.    Paragraph P, now is paragraph P


                                        169

1         ROUGH TRANSCRIPT -- DO NOT QUOTE

2  based solely upon your review of the designs?

3        A.    In Concept One's showroom.

4        Q.    Right.  So you didn't conduct any

5  research to determine whether others would agree

6  with your review?

7        A.    I was in their showroom examining

8  products.  And section P is based upon that.

9        Q.    Right.  Okay.  And so aside from

                    Page 147

204995-082108-ROUGH.txt

10   section P, the question is did you conduct any

11   research such as a blind study with others who

12   went in, looked at the products without knowing

13   the purpose of looking at the products, and then

14   reporting back to you, did you do that?

15        A.   No, because in my experience I have

16   the knowledge to see quality and understand

17   quality when I see it.

18        Q.   Okay.  But are you familiar with

19   research and double blind research techniques,

20   are you familiar with that?

21        A.   No, but I'm familiar with working

22   with retailers to choose quality products that

23   can sell at retail without damage problems.

24        Q.   But you didn't utilize any neutral

25   people who had no idea of what the purpose was


□

                                            170

1        ROUGH TRANSCRIPT -- DO NOT QUOTE

2   of the inspection to go look at the products and

3   then report to you, is that correct?

4        A.   No, I did not.

5        Q.   And paragraph Q, that's based on

6   your visit to Concept One and comparison of the

7   goods that Concept One showed you, is that

8   right?

9        A.   Yes.

10        Q.   Is it based on anything else?

11        A.   It's based upon my experience of

12   recognizing quality manufactured goods and my

13   experience of picking the right products for

                    Page 148

204995-082108-ROUGH.txt

14  retailers.

15        Q.    Okay.  And other than that, your

16  experience and your personal review is paragraph

17  Q based on anything else?

18        A.    No.

19        Q.    Is it based on any objective

20  research?

21        A.    No.

22        Q.    Now let's move to paragraph R why

23  did you include paragraph R?

24        A.    Mr. Tokayer had asked me to form an

25  opinion about the flip flops that are the style


                                              171
1         ROUGH TRANSCRIPT -- DO NOT QUOTE

2  numbers that you see there, 8080, 8075, 7084,

3  7127.  Mr. Tokayer asked me to form a separate

4  opinion on these flip flops.

5        Q.    And he gave you just these four

6  design SKUs?

7        A.    Yes.

8        Q.    What did you do in order to form an

9  opinion?

10        A.    I examined them.

11        Q.    These were designs or products?

12        A.    Samples.

13        Q.    But physical products?

14        A.    Physical.

15        Q.    And you examined them and then found

16  them to be quality designs which conformed to

                      Page 149

# EXHIBIT C

Case 1:07-cv-07998-HB-MHD     Document 48     Filed 08/22/2008     Page 36 of 40

**Creative Details #000720070312099**

## STATUS HISTORY

| Status | Date |
|---|---|
| Submitted | 03/12/2007 |
| Creative Approved | 03/28/2007 |

## NOTES/INSTRUCTIONS

1. Update production and price information click here.
2. Print tracking form (update prod. info. first)
3. Send sample, with tracking form

## DETAILS

| | |
|---|---|
| Submitted | 03/12/2007 |
| Company | CONCEPT ONE ACCESSORIES |
| Posted By | Tara La Rosa |
| Ref # | CO2100 |
| Description | co2100 - twill bucket |
| Brand | Corona Extra |
| Product Type | Image |
| Core Image | Logo Elements |
| Item Name | Headwear |
| Color | na |
| Slogan | N/A |
| Priority | Med |
| Sample Required | Yes |
| Creative Status | Approved |
| Sample Status | Pending |

## IMAGE(S)

## CONTACT HISTORY

None Found

## RELATED RECORDS

None Found

MODELO 00574

**Creative Details #000720070314017**

## STATUS HISTORY

| Status | Date |
|---|---|
| Submitted | 03/14/2007 |
| Creative Approved | 03/28/2007 |

## NOTES/INSTRUCTIONS

1. Update production and price information click here.
2. Print tracking form (update prod. info. first)
3. Send sample, with tracking form

## DETAILS

| | |
|---|---|
| **Submitted** | 03/14/2007 |
| **Company** | CONCEPT ONE ACCESSORIES |
| **Posted By** | Tara La Rosa |
| **Ref #** | CO2044 |
| **Description** | co2044 - crusher |
| **Brand** | Corona Extra |
| **Product Type** | Image |
| **Core Image** | Logo Elements |
| **Item Name** | Headwear |
| **Color** | n |
| **Slogan** | N/A |
| **Priority** | Med |
| **Sample Required** | Yes |
| **Creative Status** | Approved |
| **Sample Status** | Pending |

## IMAGE(S)

## CONTACT HISTORY

None Found

## RELATED RECORDS

None Found

**MODELO 00529**

## STATUS HISTORY

| Status | Date |
|---|---|
| Submitted | 02/28/2007 |
| Creative Approved | 03/28/2007 |

## NOTES/INSTRUCTIONS

1. Update production and price information click here.
2. Print tracking form (update prod. info. first)
3. Send sample, with tracking form

## DETAILS

| | |
|---|---|
| **Submitted** | 02/28/2007 |
| **Company** | CONCEPT ONE ACCESSORIES |
| **Posted By** | Tara La Rosa |
| **Ref #** | PRINTED RAGLAN T-SHIRT |
| **Description** | CO8002-TSHIRT |
| **Brand** | Corona Extra |
| **Product Type** | Image |
| **Core Image** | Logo Elements |
| **Item Name** | T-Shirts |
| **Color** | White |
| **Slogan** | N/A |
| **Priority** | Med |
| **Sample Required** | Yes |
| **Creative Status** | Approved |
| **Sample Status** | Pending |

## IMAGE(S)

## CONTACT HISTORY

None Found

## RELATED RECORDS

None Found

**MODELO 00614**

## STATUS HISTORY

| Status | Date |
|---|---|
| Submitted | 03/02/2007 |
| Creative Approved | 03/28/2007 |

## NOTES/INSTRUCTIONS

1. Update production and price information click here.
2. Print tracking form (update prod. info. first)
3. Send sample, with tracking form

## DETAILS

| | |
|---|---|
| **Submitted** | 03/02/2007 |
| **Company** | CONCEPT ONE ACCESSORIES |
| **Posted By** | Tara La Rosa |
| **Ref #** | Reversible Steep Knit cap |
| **Description** | 73-18-7870-Knit Cap |
| **Brand** | Corona Extra |
| **Product Type** | Image |
| **Core Image** | Crown |
| **Item Name** | Headwear |
| **Color** | Blue |
| **Slogan** | N/A |
| **Priority** | Med |
| **Sample Required** | Yes |
| **Creative Status** | Approved |
| **Sample Status** | Pending |

## IMAGE(S)

## CONTACT HISTORY

None Found

## RELATED RECORDS

None Found

**MODELO 00606**

**Creative Details #000720070302039**

## STATUS HISTORY

| Status | Date |
|---|---|
| Submitted | 03/02/2007 |
| Creative Approved | 03/28/2007 |

## NOTES/INSTRUCTIONS

1. Update production and price information click here.
2. Print tracking form (update prod. info. first)
3. Send sample, with tracking form

## DETAILS

| | |
|---|---|
| **Submitted** | 03/02/2007 |
| **Company** | CONCEPT ONE ACCESSORIES |
| **Posted By** | Tara La Rosa |
| **Ref #** | Reversible Tipd Knit cap |
| **Description** | 73-18-7871-Knit Cap |
| **Brand** | Corona Extra |
| **Product Type** | Image |
| **Core Image** | crown |
| **Item Name** | Headwear |
| **Color** | Pink |
| **Slogan** | N/A |
| **Priority** | Med |
| **Sample Required** | Yes |
| **Creative Status** | Approved |
| **Sample Status** | Pending |

## IMAGE(S)

## CONTACT HISTORY

None Found

## RELATED RECORDS

None Found

**MODELO 00605**